[Cite as *Jones v. Durrani*, 2024-Ohio-1776.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JOAN JONES, | : | APPEAL NO. C-220426 |
| | | TRIAL NO. A-1706486 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| Defendants-Appellants. | : | |

| | | |
|---|---|---|
| DANA CONLEY, | : | APPEAL NO. C-220427 |
| | | TRIAL NO. A-1706427 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | *O P I N I O N.* |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| Defendants-Appellants. | : | |

Civil Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed in Part and Reversed in Part

Date of Judgment Entry on Appeal:  May 10, 2024

*Benjamin M. Maraan II*, *Statman Harris, LLC*, and *Alan Statman*, for Plaintiffs-Appellees.

*Taft Stettinius & Hollister LLP*, *Philip D. Williamson*, *Aaron M. Herzig*, *Russell S. Sayre*, *Reminger Co., LPA*, and *Rick L. Weil*, for Defendants-Appellants.

**ZAYAS, Presiding Judge.**

{¶1} Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies ("CAST") (collectively referred to as "defendants") appeal from the judgments of the trial court entering final judgment in each underlying action in favor of plaintiffs-appellees Joan Jones and Dana Conley (collectively referred to as "plaintiffs"). In two assignments of error, defendants argue that the trial court should have granted them a new trial in each action and should not have awarded the plaintiffs prejudgment interest. For the reasons that follow, we reverse the judgments of the trial court in part as to the award of prejudgment interest in each case but affirm the judgments of the trial court in all other respects.

## I. Brief Procedural History

{¶2} Plaintiffs each filed a separate medical-malpractice action against the defendants, arising from a spine surgery performed on them by Dr. Durrani.[1] The complaints each asserted claims against Dr. Durrani for negligence, battery, lack of informed consent, and fraud, and against CAST for vicarious liability. In essence, the complaints asserted that, while an employee and/or agent of CAST, Dr. Durrani breached the requisite standard of care when selecting and performing the spine surgeries, failed to obtain proper informed consent prior to the surgeries, committed battery by performing unnecessary and uninformed surgery without proper consent, and induced plaintiffs to undergo the surgeries by fraudulently misrepresenting the need for surgery.

{¶3} Each action was maintained as a separate action below, but the trial court ultimately joined the actions for trial. A seven-day jury trial was held, and

---

[1] Each complaint also asserted claims against West Chester Hospital, LLC, and UC Health. However, these defendants were subsequently dismissed from each action.

verdicts were ultimately entered in favor of each plaintiff on their negligence and fraudulent-misrepresentation claims. The jury awarded Ms. Jones $280,133.28 in compensatory damages and $1 in punitive damages, and Mr. Conley $420,331.82 in compensatory damages and $1 in punitive damages. Further, after a postjudgment request from each plaintiff, the trial court awarded Ms. Jones $44,790.62 in prejudgment interest and Mr. Conley $67,207.02 in prejudgment interest.

## II. The Joint Trial

### A. Testimony of Joan Jones

{¶4} At trial, Ms. Jones testified that she experienced back pain on and off since 1959 and went to see Dr. Durrani in 2012 after trying various treatments and medications that never provided lasting relief. At the visit, Dr. Durrani told her he could do surgery and it would "take the pain away." Dr. Durrani asked her to obtain her previous x-ray and MRI images and bring them to him. He put the MRI up on the screen and said, "[R]ight there is your problem." She testified, "The only thing he said is, there's your problem, and I can take away the pain." She denied that Dr. Durrani ever told her what surgery he was going to do. Ms. Jones ultimately underwent spinal surgery in the L5-S1 area. She testified that her back condition was worse after the surgery and is worse today than it was before surgery and her ability to enjoy life is worse after the surgery. She said that she was never able to walk or do things after the surgery like she could before and is still in constant pain and has never been able to stop taking pain medications.

### B. Testimony of Dana Conley

{¶5} Mr. Conley testified that he experienced back pain for over 30 years and went to see Dr. Durrani in 2012 for back and neck pain after physical therapy and chiropractic treatment were unsuccessful. After ordering an MRI, Dr. Durrani

reviewed the MRI with Mr. Conley and told him that "if we didn't do something, he pointed out the bad areas, that if I was in, like, an accident or any further injuries to myself, that I could possibly become paralyzed." Surgery was successfully performed on his neck first. He had spine surgery two months later in the L5-S1 area. He testified that he was miserable after the spine surgery, and when asked if it ever got better, he said, "[N]ot really." He denied that the surgery fixed his pain. He said he has more symptoms (numbness and irritation) now than he did prior to surgery. He has been doing pain management for over eight years since the surgery and had to stop the neighborhood mowing business he had before the surgery. He can no longer take long walks, be intimate with wife, "hang out" in the garage with his friends, or be happy without medication.

### C. Testimony of Lisa Conley

{¶6} Mr. Conley's wife testified that Mr. Conley was able to drive, walk, stand, go up and down stairs, do some household chores, and do yard work prior to surgery. She testified that, at the first visit, Dr. Durrani said, "I can fix it," in reference to Mr. Conley's lower back. Further, she said, at the visit after the MRI, Dr. Durrani said that Mr. Conley would lose the ability to be mobile on his legs if he did not get surgery. She testified, "[B]asically what he told us is he's done the surgery several times, and he's been successful, and that he could fix [Mr. Conley.] And that's what we were hearing. He could fix him. He would be able to, you know, do things without having any kind of pain." When asked how Dr. Durrani explained the alternative to not have surgery, she said, "That [Mr. Conley] would lose the ability to use his legs and be able to walk." She testified that she did not observe any improvement in Mr. Conley after the surgery. Rather, "it got worse."

4

**D. Testimony of Plaintiffs' Experts**

{¶7}   Dr. Steven Bloomfield, a neurosurgeon, testified as to his opinion that Dr. Durrani breached the standard of care in each case by misrepresenting, exaggerating, and/or fabricating certain history and imaging impressions in order to justify surgery that was not medically necessary.  He testified separately regarding each plaintiff and his opinion as to the specific misrepresentations, exaggerations, and/or fabrications that were made by Dr. Durrani to each plaintiff and testified that no flexion/extension study was conducted by Dr. Durrani on either plaintiff.

{¶8}   Dr. Keith Wilkey, an orthopedic surgeon, testified as to his comparison of the original radiologist's impressions of each plaintiff's imaging versus Dr. Durrani's impressions and expressed his opinion as to why he agreed with the radiologist's impressions and felt that Dr. Durrani's impressions were inaccurate or false. Regarding Ms. Jones, he testified that Dr. Durrani breached the standard of care by performing a surgery that "wasn't addressing a problem that she actually had."  He opined that Dr. Durrani lied about the existence of certain conditions to induce Ms. Jones into having surgery.  Regarding Mr. Conley, he testified as to his opinion that Dr. Durrani breached the standard of care by performing a surgery that "was not necessary. It was not indicated. And it resulted in significant harm." When discussing Dr. Durrani's impressions of Mr. Conley, he said, "So this should look very similar. Very similar to what our last patient had.  And I'm going to tell you this is a template. These [impressions] are exactly what our last patient had. Because this is what it takes to get surgery approved."  He said that the surgery performed on each plaintiff was "exactly the same."  He also testified that no flexion/extension study was conducted by Dr. Durrani for either plaintiff.  When asked if he believed in both cases that Dr.

Durrani knowingly deceived the plaintiffs into having surgery, he answered, "Beyond any doubt."

{¶9} Dr. Ranjiv Sanai, a radiologist, testified as to his opinion of each plaintiff's imaging in comparison to the original radiologist's and Dr. Durrani's impressions, and opined that Dr. Durrani breached the standard of care by performing surgery on Ms. Jones as, "the area that Dr. Durrani operated on, there is nothing significantly wrong with the patient at those levels to warrant surgery, at least not the type of surgery that was warranted [sic]. There were other things wrong at other levels, but Dr. Durrani did not address those." He testified that Dr. Durrani misread the radiology and put Ms. Jones through unnecessary surgery. As to Mr. Conley, he was asked at the conclusion of his direct testimony if his opinion regarding the breach of the standard of care was the same for Mr. Conley as it was for Ms. Jones's case, and he agreed that it was and agreed that it was his opinion that the radiology was not appropriately read, and unnecessary surgery was recommended. He also said, regarding Mr. Conley, that no flexion/extension study was ever completed.

### E. Testimony of Defense Experts

{¶10} Dr. Paul Kaloostian, a neurosurgeon, testified as to his impression of a 2007 MRI that was done on Ms. Jones, as well as the 2012 MRI. He opined that he agreed with Dr. Durrani's impressions of the 2012 MRI based on both MRIs and Ms. Jones's history. He testified that his opinion, based on both MRIs and Ms. Jones's history, was that Dr. Durrani's treatment and surgery was "very appropriate and within the standards of care of any spinal surgery." However, he conceded on cross-examination that he did not know if Dr. Durrani ever requested or obtained Ms. Jones's preexisting records and said that he "believed" plaintiff's counsel was correct that Dr. Durrani did not obtain her preexisting records. As to Mr. Conley, he similarly

6

testified as to his findings of Mr. Conley's MRI and opined that he agreed with Dr. Durrani's findings based on the MRI and the patient's history. Specifically, when asked if it was his opinion that, based on Mr. Conley's history and imaging, the surgery was reasonable, appropriate, and within the standard of care, he said, "100 percent yes." Further, he was asked if the surgeries performed on each plaintiff "actually" helped them, he said, "They clearly did." On cross-examination, he conceded that Dr. Durrani did not do flexion/extension studies.

{¶11} Dr. Mark Younis, a diagnostic radiologist, testified as to his impressions from each plaintiff's MRI and his opinion of Dr. Durrani's impressions of each plaintiff's imaging. He opined that the impressions based on the imaging were correct but seemed reluctant to opine on "clinical" impressions or answer any "clinical" questions. When asked if he saw any evidence to support a claim that either plaintiff sustained an injury to his or her spine as a result of the surgeries, he replied, "I saw nothing radiographically to support that." When asked if Dr. Durrani, in his review and interpretation of the radiology images for both plaintiffs, met the standard of care with regard to his impressions, he replied, "Yes. His interpretations met the standard of care." On cross-examination, he clarified that his opinion was "limited to the imaging because that's all I'll do. Nothing else. Not surgery, not followup [sic], not prognosis."

### III. The Verdicts

### A. Joan Jones

{¶12} First, the jury found that Dr. Durrani was negligent in his care and treatment of Ms. Jones and that such negligence was a proximate cause of harm to her. In the interrogatory asking the jury to explain in what respects Dr. Durrani was negligent, the jury responded, "No flexion extensions film/study performed. Dr.

Durrani did not explore non-surgical options within standard of care." Next, the jury did not find that Dr. Durrani failed to acquire informed consent from Ms. Jones for the surgery or committed battery on Ms. Jones by performing the surgery. Finally, the jury found that Dr. Durrani fraudulently misrepresented to Ms. Jones the necessity or medical indication for surgery and that such fraudulent misrepresentation was a proximate cause of harm to her. The jury awarded Ms. Jones $280,133.28 in compensatory damages: $160,133.28 for past medical expenses, $80,000 for past pain and suffering, $40,000 for past loss of enjoyment of life, and $0 for future loss of enjoyment of life. Additionally, the jury found that Dr. Durrani acted with actual malice or aggravated or egregious fraud, due to, "Fraudulent misrepresentation of patient's condition resulting in the conscious disregard for safety of the patient." The jury consequently awarded Ms. Jones $1 in punitive damages and awarded Ms. Jones attorney fees.

## A. Dana Conley

{¶13} First, the jury found that Dr. Durrani was negligent in his care and treatment of Mr. Conley and that such negligence was a proximate cause of harm to him. In the interrogatory asking the jury to explain in what respects Dr. Durrani was negligent, the jury responded, "No flexion extensions film/study performed. Dr. Durrani did not explore non-surgical options within standard of care." Next, the jury did not find that Dr. Durrani failed to acquire informed consent from Mr. Conley for the surgery or committed battery on Mr. Conley by performing the surgery. Finally, the jury found that Dr. Durrani fraudulently misrepresented to Mr. Conley the necessity or medical indication for surgery and that such fraudulent misrepresentation was a proximate cause of harm to him. The jury awarded Mr. Conley $420,331.82 in compensatory damages: $125,331.82 for past medical expenses, $25,000 for past pain

and suffering, $200,000 for future pain and suffering, $20,000 for past loss of enjoyment of life, and $50,000 for future loss of enjoyment of life. Additionally, the jury found that Dr. Durrani acted with actual malice or aggravated or egregious fraud, due to, "Fraudulent misrepresentation of patient's condition resulting in the conscious disregard for safety of the patient." The jury consequently awarded Mr. Conley $1 in punitive damages and awarded Mr. Conley attorney fees.

### IV. Postjudgment Proceedings

{¶14} Defendants subsequently filed motions for judgment notwithstanding the verdict and/or a new trial in each case. In substantially identical motions, they argued that the cumulative effect of comments from counsel at trial regarding Dr. Durrani's absence and the negative-inference instruction given to the jury regarding Dr. Durrani's absence was prejudicial and warranted a new trial. In substantially identical judgment entries, the trial court denied the motions, finding that it did not err in allowing counsel to comment on Dr. Durrani's absence or by giving a negative-inference jury instruction.

{¶15} Plaintiffs each subsequently filed motions for prejudgment interest. In substantially identical motions, they argued they are entitled to an award of prejudgment interest under R.C. 1343.03(C) from the time of the original complaint to present as defendants failed to make a good-faith effort to settle the case. The motions asserted that Dr. Durrani's maintained defense has been that the case was "defensible" as evidenced by their retained experts, but the consistent jury verdicts against them in other cases against Dr. Durrani (12 out of 14 in 2021) prove that juries consistently believe the plaintiffs. The motions further asserted that the defense acknowledged they had "little chance" of prevailing and that the verdict could exceed $1 million, yet they never offered to settle. The motion claimed that the only

9

settlement the defendants were willing to consider was a "global settlement," which was "ridiculously low." Lastly, the motions asserted that the court was "quite familiar" with the growing number of verdicts that are exceeding "coverage limits covered by the caps."

{¶16}  After holding a hearing on the motions, the trial court—in substantially identical judgment entries—granted the motions for prejudgment interest "for the reasons set forth by the plaintiff at the May 26th hearing." The trial court ultimately awarded Ms. Jones $44,790.62 in prejudgment interest and Mr. Conley $67,207.02 in prejudgment interest.

{¶17}  After resolution of all postjudgment issues, the trial court entered a final judgment in each case on August 8, 2022. Defendants timely appealed from each final judgment.[2]

### V. Law and Analysis

{¶18}  In their first assignment of error, defendants argue that the trial court should have granted them a new trial in each case as (1) the trial court should not have conducted a multiplaintiff trial and (2) should not have issued a negative-inference jury instruction.

### A. The Joint Trial

{¶19}  "If actions before the court involve common questions of law or fact, the court may * * * join for * * * trial any or all matters at issue in the actions." Civ.R. 42(A)(1)(a).

---

[2] This court consolidated the appeals after briefing as the briefing was identical in each case and both appeals arise from issues related to the joint trial in which all parties were involved and/or postjudgment issues that were raised in each case, which involved substantially identical briefing and proceedings and substantially identical judgments.

**{¶20}** The decision to consolidate or join cases under Civ.R. 42(A) is within the discretion of the trial court and the decision will not be reversed absent an abuse of discretion. *Siuda v. Howard*, 1st Dist. Hamilton Nos. C-000656 and C-000687, 2002-Ohio-2292, ¶ 10.

**{¶21}** When making the decision whether to join the matters for trial, the court "must determine if there is sufficient commonality of issues and parties to warrant [joining] the cases." *Id.*, citing *Jamestown Village Condominium Owners Assn. v. Market Media Research, Inc.*, 96 Ohio App.3d 678, 687, 645 N.E.2d 1265 (8th Dist.1994), and *Waterman v. Kitrick*, 60 Ohio App.3d 7, 14, 572 N.E.2d 250 (10th Dist.1990).

**{¶22}** Defendants argue that joining the instant cases for trial was improper under Civ.R. 42 as the cases do not involve common questions of law or fact. On the other hand, plaintiffs argue that the joinder was proper as each case involved surgeries on the lumbar spine at L5-S1, and involved the same claims, issues, and experts.

**{¶23}** A review of the record reveals that the underlying crux of each action was certain "impressions" or representations that Dr. Durrani made regarding surgery after reviewing each patient's history and imaging. The representations and/or impressions were set forth in respective letters drafted by Dr. Durrani after evaluating each patient. For Ms. Jones, Dr. Durrani represented in her letter that the imaging showed "severe disk degeneration at the L5-S1 level. There are multiple levels of old compression fractures. There is spinal stenosis at the L3-L4 levels as well. Axial images show L5-S1 left foraminal stenosis, moderate category." Additionally, he set forth eight specific impressions based on Ms. Jones's history and imaging: (1) lumbar spinal stenosis, L5-S1, L3-L4; (2) prior lumbar fractures at L1 and subacute at T12; (3) back pain with radicular pain in the L5 distribution bilaterally; (4) symptoms of

neurogenic claudication; (5) very significant functional impairment; (6) anterolisthesis of L5 on S1; (7) central stenosis, lateral recess stenosis at L3-L4 and L5-S1; and (8) failure of conservative treatment for over 40 years. From these findings, Dr. Durrani recommended an "L5-S1 TLIF" on the left side "with a posterior spinal instrumentation and fusion." He stated, "I told her that it will take care of some of her pain. She has other issues in the back that may still linger on to have some pain issues but where she is complaining of most of her pain is L5-S1."

{¶24} For Mr. Conley, Dr. Durrani represented in his letter that the imaging showed "grade 1 listhesis of L5 on S1, severe lumbar spinal stenosis, L5-S1 with large disk herniation. This is causing severe stenosis bilaterally in both the nerve roots which is causing the radiculopathy he has been suffering from." Further, he set forth eight specific impressions from Mr. Conley's history and imaging: (1) lumbar spinal stenosis, L5-S1, bilateral; (2) lumbar degenerative spondylolisthesis, L5-S1; (3) back pain with severe radicular pain in the L5 distribution bilaterally; (4) very significant functional impairment; (5) anterolisthesis of L5 on S1; (6) central stenosis; (7) bilateral advanced lateral recess stenosis; and (8) failure of conservative treatment for many, many months. From these findings, Dr. Durrani recommended a "lumbar anterior interbody fusion at L5-S1 with posterior spinal instrumentation and fusion, lumbar laminectomy and decompression, bilateral foraminotomy."

{¶25} A review of these largely-overlapping impressions by the jury—in large part—concerned the various forms of possible spinal stenosis and other similar conditions that may be present in the L5-S1 area generally and whether those conditions existed—and warranted surgery—for each plaintiff. The impressions of the original radiologist who first reviewed each plaintiff's imaging was also included as evidence and used as a comparison to Dr. Durrani's findings. Further, each expert

12

testified as to his or her own opinion on whether these conditions existed in each plaintiff based on the imaging. Consequently, the jury's understanding of the specific conditions at issue in the L5-S1 area of the spine was pertinent and predominated in both cases. Hence, a large amount of the expert testimony went to explaining the spine and these conditions generally and what would need to be present in a patient's imaging to warrant such representations. Accordingly, we fail to see how we could hold that there was no common question of fact between the two cases when the technicality of understanding these conditions was a predominate issue in each case. Additionally, each case presented the same claims against the same defendants based on the same theory of malpractice and/or fraud surrounding these conditions. *See Suida*, 1st Dist. Hamilton Nos. C-000656 and C-000687, 2002-Ohio-2292, at ¶ 12.

{¶26} Civ.R. 42(A) does not require that all questions of law and fact be identical, *see Clemente v. Gardner*, 5th Dist. Licking No. 2002CA00120, 2004-Ohio-2254, ¶ 18, and the trial court reminded the jury that each plaintiff's case should be considered on its own merit. We presume the jury followed that instruction. *See, e.g., Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph four of the syllabus ("A presumption always exists that the jury has followed the instructions given to it by the trial court."). Further, the jury's verdicts—in which some claims by each plaintiff prevailed and some did not—indicate that the jury was able to successfully parse through the evidence and reach independent conclusions as to both the common and unique questions of law and fact.

{¶27} Accordingly, we hold that the trial court did not abuse its discretion under Civ.R. 42 when joining the instant cases for trial. Therefore, we overrule this portion of the first assignment of error.

**B. Absent-Defendant Jury Instruction**

**{¶28}** Defendants next argue that the trial court erred in giving a negative-inference jury instruction regarding Dr. Durrani's absence and that such error was prejudicial to the point that a new trial is warranted.

**{¶29}** "We review a trial court's decision granting or denying a proposed jury instruction for an abuse of discretion." *Hounchell v. Durrani*, 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, ¶ 65, citing *State v. Houston*, 1st Dist. Hamilton No. C-190598, 2020-Ohio-5421, ¶ 34. However, "[t]he question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22.

**{¶30}** The trial court instructed the jury as follow:

The defendant, Dr. Durrani, did not attend these proceedings in person. He is represented here by counsel. You shall not speculate on why he is not present or consider his absence for any purpose except as instructed below.

Dr. Durrani has voluntarily left the jurisdiction removing himself from plaintiff's ability to subpoena him to trial. When a party such as Dr. Durrani has relevant evidence or testimony within his or her control, and the party failed to produce that relevant evidence or testimony, that failure *gives rise* to an inference that the evidence or testimony is unfavorable to that party.

(Emphasis added.)

**{¶31}** This court has recently held that the trial court erred when instructing a jury on Dr. Durrani's absence from trial where the instruction given permitted the

jury to draw any inference it wished to from Dr. Durrani's absence, even impermissible or negative inferences such as consciousness of guilt or implicit biases. *Hounchell* at ¶ 65-70. Here, the instruction at issue is more limited. It permits only the inference that the testimony or evidence in Dr. Durrani's possession would be unfavorable to him. Nevertheless, a question arises as to whether this inference is a permissible inference.

**{¶32}** In giving this instruction, the trial court relied on the general rule that "if it appears from the evidence that a litigant knows of the existence of a witness and such witness is within the control of the litigant whose interest it would naturally be to produce him, and without satisfactory explanation he fails to do so, the jury *may* draw an inference that the testimony of the witness would not have been favorable to him." (Emphasis added.) *Llewellyn v. Cincinnati St. Ry. Co.*, 66 Ohio App. 107, 32 N.E.2d 33 (1st Dist.1940).

**{¶33}** In *Silveous v. Rensch*, 20 Ohio St.2d 82, 253 N.E.2d 758 (1969), the Ohio Supreme Court addressed whether a jury instruction stating this rule was proper. The court said, "This category of special instruction has its origin in the theory that the failure to produce evidence which a fearless claimant would naturally produce *permits* the inference that the tenor of the evidence would be unfavorable to such claimant." (Emphasis added.) (Citation omitted.) *Silveous* at 84. The underlying litigation in the action was a personal-injury action, and the question presented was whether such an instruction was appropriate as to the failure of the treating physician to testify in the action. *Id.* at 82, 84. The court said:

> Neither the controverted instruction given in the case at bar, nor any part of the court's instructions, advised the jury regarding guidelines to be observed in determining the application of the word

15

'naturally' as used in the instruction. Ordinarily, it could not be said that such a claimant would 'naturally' call a witness whose testimony would be merely cumulative or inferior to that offered by other witnesses. If there is adequate relevant evidence on a particular issue, any additional evidence on that issue complained of as being absent is only cumulative, and its character as plaintiff's 'natural' evidence is palled. To allow an unfavorable inference to be drawn from the nonproductivity of such evidence would serve to emasculate the historical basis for allowing the instruction.

Counsel, in argument and in their briefs, have focused on [the treating physician] as the object of the instruction because he was not produced at trial. In view of the introduction of evidence from the summary sheet of the hospital records that [the treating physician] diagnosed plaintiff's condition as a sprain of the neck and lacerations, it is unfair to allow the jury, by instruction, an opportunity to infer that plaintiff would *naturally* call the doctor, and to also infer that his testimony would have been unfavorable to his patient. There is nothing in the record from which the court or jury could have found that [the treating physician]'s testimony would not be inferior, cumulative, or evidence which plaintiff would naturally produce.

(Emphasis sic.) *Id*. at 84.

**{¶34}** Here, the wording of the given instruction indicates that Dr. Durrani's failure to produce relevant evidence or testimony "gives rise" to an inference that the relevant evidence is adverse. In other words, the instruction necessarily requires the inference to be made in such a circumstance, rather than simply permitting the

16

inference to be made if the jury so chooses. Additionally, the instruction allowed the inference to be made based on the failure to be produce *any* relevant evidence in his possession and did not limit the instruction to only that evidence which Dr. Durrani would "naturally" produce, i.e., evidence that was not cumulative or inferior to other evidence already produced. Because the instruction was not permissive nor limited to evidence that would naturally be produced, we hold that the trial court erred in giving this instruction to the jury.

{¶35} Nevertheless, an "affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Hounchell*, 1st Dist. Hamilton No. C-220021, 2023-Ohio-2501, at ¶ 72, quoting *Cromer*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, at ¶ 35. "Rather, '[i]f there is no inherent prejudice in the inclusion of a particular jury instruction, prejudice must be affirmatively shown on the face of the record, and it cannot be presumed.' " *Id.*, citing *Cromer* at ¶ 35.

{¶36} " 'In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." ' " *Cromer* at ¶ 35, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995). "If the complete set of instructions by the trial court otherwise fairly and correctly lays out the relevant law, and if it is apparent in the context of the complete instructions that an isolated error did not prejudice a party's substantial rights, reversal on the error is not warranted." *Id.*, citing *Centrello v. Basky*, 164 Ohio St. 41, 128 N.E.2d 80 (1955), paragraph eight of the syllabus. "The general rule is that an erroneous instruction does not necessarily mislead a jury." *Id.* at ¶ 36, citing *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.*, 18 Ohio St.3d 268, 274-275, 480 N.E.2d 794 (1985). "The same rule applies in a medical-malpractice

17

case." *Id.*, citing *Hayward v. Summa Health Sys./Akron City Hosp.*, 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243, ¶ 33.

{¶37}  Here, a review of the jury instructions as whole does not indicate that the jury was probably misled by the erroneous instruction.  Of relevance, the trial court instructed the jury as follows on evidence and inferences:

> Evidence is all of the testimony received from the witnesses and the exhibits admitted during the trial and facts agreed upon by counsel and any fact which the Court requires you to accept as true.  Evidence may be direct or circumstantial or both.  Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies.  It includes exhibits admitted into evidence during the trial.  Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related connected facts which naturally and logically follow according to the common experiences of humankind.
>
> To infer or to make an inference is to reach a reasonable conclusion of facts which *you may, but are not required to*, make from other facts which you find have been established by direct evidence. *Whether an inference is made rests entirely on you.*  You may not build one inference upon another inference, but you may make more than one inference from the same facts or circumstances.  You may consider both direct and circumstantial evidence.  You must decide from all the direct and circumstantial evidence taken together whether a party who has the burden of proof has met that burden.

(Emphasis added.)

18

**{¶38}** Thus, although the absent-defendant instruction erroneously said that Dr. Durrani's absence "gives rise" to the inference in the instruction, the jury instructions as a whole make clear that an inference is permissive and not required to be made. The instructions also clearly set forth what evidence should be considered by the jury in rendering its decision.

**{¶39}** Additionally, a thorough review of the entire proceedings reveals that the jury was not misled. The jury found in favor of the defendants on two of each plaintiff's claims. Further, the jury interrogatories show that the jury relied on actual evidence that was presented at trial when making its findings in favor of the plaintiffs.

**{¶40}** Consequently, we see no indication on the face of the record that the erroneous instruction was so prejudicial as to require reversal. *See Hayward*, 139 Ohio St.3d 238, 2014-Ohio-1913, 11 N.E.3d 243, at ¶ 25 ("To conclude that a party's substantial rights were materially affected, an appellate court must find that the jury charge was so misleading and prejudicial as to result in an erroneous verdict."). Therefore, this portion of the first assignment of error is overruled.

### C. Prejudgment Interest

**{¶41}** In their second assignment of error, defendants argue that the trial court should have entered judgment in their favor on the issue of prejudgment interest. In essence, they argue that there was insufficient evidence to support the trial court's factual findings under R.C. 1343.03(C).

**{¶42}** R.C. 1343.03(C) allows certain prejudgment interest if, upon motion, "the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." "A party has not 'failed to make a good faith effort

to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party." *Kalain v. Smith*, 25 Ohio St.3d 157, 159, 495 N.E.2d 572 (1986). "If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Id.* "The decision as to whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court." (Citation omitted.) *Id.* The decision will not be overturned unless the trial court's actions indicate an abuse of discretion. *Id.*

{¶43} The record reflects that, while the trial court did hold a hearing on this issue, no "evidence" was taken at the hearing nor was any evidence submitted with the motions for prejudgment interest. Unsworn allegations cannot constitute "evidence" for purposes of R.C. 1343.03(C). *Cunning v. Windsor House, Inc.*, 2023-Ohio-352, 208 N.E.3d 246, ¶ 125 (11th Dist.). Consequently, there is no "evidence" in the record to establish any facts regarding settlement efforts by the parties. *See id.* at ¶ 119-130. Therefore, we hold that the trial court abused its discretion in awarding prejudgment interest as there is no evidence in the record to support its factual findings under R.C. 1343.03(C). The second assignment of error is accordingly sustained.

## VI. Conclusion

{¶44} For all the foregoing reasons, we overrule the first assignment of error and sustain the second assignment of error. The judgments of the trial court are reversed in part as to the awards of prejudgment interest but affirmed in all other respects.

Judgments affirmed in part and reversed in part.

**CROUSE** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its own entry this date.