# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MARY RAVENSCRAFT, | : | APPEAL NO. C-240297 |
| | | TRIAL NO. A-1506161 |
| Plaintiff-Appellee, | : | |
| and | : | |
| GREGORY RAVENSCRAFT, | : | |
| Plaintiff, | : | |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| | : | |
| Defendants-Appellants. | : | |

| | | |
|---|---|---|
| ARLETTA SUE BOWLING, | : | APPEAL NO. C-240298 |
| | | TRIAL NO. A-1601973 |
| Plaintiff-Appellee, | : | |
| and | : | |
| CURTIS BOWLING, | : | |
| Plaintiff, | : | *JUDGMENT ENTRY* |
| vs. | : | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | |
| and | : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | |
| | : | |
| Defendants-Appellants, | : | |

and                                          :

WEST CHESTER HOSPITAL, LLC,          :

and                                          :

UC HEALTH                                    :

    Defendants.                          :


This cause was heard upon the appeals, the records, the briefs, and arguments.

The judgments of the trial court are affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 8/15/2025 per order of the court.**


**By:**_____
       **Administrative Judge**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| MARY RAVENSCRAFT, | : | APPEAL NO. | C-240297 |
| | | TRIAL NO. | A-1506161 |
| Plaintiff-Appellee, | : | | |
| and | : | | |
| GREGORY RAVENSCRAFT, | : | | |
| Plaintiff, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE | : | | |
| TECHNOLOGIES, | : | | |
| Defendants-Appellants. | : | | |

| | | | |
|---|---|---|---|
| ARLETTA SUE BOWLING, | : | APPEAL NO. | C-240298 |
| | | TRIAL NO. | A-1601973 |
| Plaintiff-Appellee, | : | | |
| and | : | | |
| CURTIS BOWLING, | : | *O P I N I O N* | |
| Plaintiff, | : | | |
| vs. | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| CENTER FOR ADVANCED SPINE | : | | |
| TECHNOLOGIES, | : | | |
| Defendants-Appellants, | : | | |

and                                      :

WEST CHESTER HOSPITAL, LLC,              :

and                                      :

UC HEALTH,                               :

Defendants.                              :

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: August 15, 2025

*Statman Harris, LLC,* and *Alan J. Statman*, for Plaintiffs-Appellees Mary Ravenscraft and Arletta Sue Bowling,

*Taft Stettinius & Hollister LLP, Philip D. Williamson, Aaron M. Herzig, Annie M. McClellan*, and *Russel S. Sayre*, for Defendants-Appellants Abubakar Atiq Durrani, M.D. and Center For Advanced Spine Technologies.

**Bock, Judge.**

**{¶1}** We sua sponte consolidate the appeals of defendants-appellants Abubakar Atiq Durrani, M.D. and Center For Advanced Spine Technologies ("CAST") (collectively "Durrani parties") from the trial court's judgments awarding damages to plaintiffs-appellees Mary Ravenscraft and Arletta Sue Bowling (collectively, "the patients").[1] The Durrani parties present four assignments of error from the judgments in favor of the patients. The assignments in the two appeals are nearly identical. We overrule the Durrani parties' assignments of error for the following reasons.

**{¶2}** First, this court's precedent compels us to hold that the trial court did not abuse its discretion by holding a joint trial.

**{¶3}** Second, while the trial court improperly admitted evidence of Dr. Durrani's habitual assurances to patients without a proper foundation, that error was harmless because the patients testified that Dr. Durrani made similar assurances to them before their surgeries. And there is no indication that the jury relied on that habit evidence to reach its verdict.

**{¶4}** Third, Evid.R. 601(B)(5)(b)'s amendment, which altered the timeframe for the rule requiring witnesses giving expert testimony in medical-malpractice actions to devote more than half of their professional time to practicing medicine, is retroactive and applies to this matter, so the patients' expert was permitted to testify as he satisfied the amended rule's clinical-practice requirement.

**{¶5}** Fourth, the trial court was within its discretion when it declined to instruct the jury on Bowling's comparative negligence. The evidence did not show that

---

[1] Gregory Ravenscraft's claim was ultimately dismissed, and Curtis Bowling had no claims independent of Arletta Sue Bowling's claims. For the purposes of this opinion, "Ravenscraft" refers to Mary Ravenscraft and "Bowling" refers to Arletta Sue Bowling.

Bowling's failure to complete physical therapy recommended by Dr. Durrani caused or contributed to Bowling's injury.

{¶6} Fifth, the trial court's erroneous jury instruction that Dr. Durrani's absence at trial gave rise to a negative inference was ultimately harmless because the trial court explained that the decision to draw an inference rested with the jury.

{¶7} Sixth, the trial court was within its discretion to allow Dr. Saini, a neuroradiologist, to testify about operative reports, explain surgeries and recovery times, and assess Dr. Durrani's surgical technique because that testimony involved his interpretation of the patients' medical imaging, which falls within the scope of a neuroradiologist's area of expertise.

{¶8} Finally, the Durrani parties forfeited their challenge to the trial court's omission of their proposed damages-itemization interrogatory when they failed to object to the omission and did not argue plain error on appeal.

{¶9} Finding no reversible error, we affirm the trial court's judgments.

## I.     *Factual and Procedural History*

{¶10} In 2015, Ravenscraft sued the Durrani parties for damages related to an array of issues surrounding an allegedly unnecessary spinal-fusion surgery performed on her by Dr. Durrani in 2013. Ravenscraft raised multiple claims, including negligence, a lack of informed consent, and fraud.

{¶11} In 2016, Bowling sued Dr. Durrani, CAST, West Chester Hospital, LLC, and UC Health for damages related to an allegedly unnecessary spinal-fusion surgery performed on her by Dr. Durrani. Bowling's claims also included negligence, a lack of informed consent, and fraud.

{¶12} In 2020, Ravenscraft, Bowling, and many other plaintiffs suing Dr. Durrani moved for "group trials." After a hearing, the trial court granted the plaintiffs'

motions and ordered the Ravenscraft and Bowling cases to be joined for trial.

### *Joint trial*

{¶13} At trial, Ravenscraft's and Bowling's testimony, supported by their medical records, narrated their respective medical journeys that culminated in Dr. Durrani's diagnoses and surgical interventions, as well as their post-surgery conditions. The jury also heard from Dr. Tayeb, a former CAST employee; plaintiffs' experts—Drs. Bloomfield, Wilkey, and Saini; and defendants' experts—Drs. Purcell and Kaloostian.

{¶14} Dr. Durrani submitted nearly identical insurance authorization requests for Ravenscraft and Bowling to treat lumbar degenerative disc disease and lumbar spinal stenosis. Spinal stenosis refers to a "narrowing" of the spinal canal and can be mild, moderate, or severe depending on the compression of the spinal nerves and symptoms. A "severe" spinal stenosis refers to "[i]mpingement [and] displacement" of the spinal nerves, which are "squeezed" as the spinal canal narrows.

{¶15} Dr. Durrani also diagnosed Ravenscraft and Bowling with "degenerative spondylolisthesis" in the L5-S1 spinal joint. Spondylolisthesis is a "slippage or malalignment of one vertebral body to the other." Anterolisthesis is slippage or malalignment where "the top [vertebrae] is forward in relationship to the bottom [vertebrae]." Retrolisthesis is slippage or malalignment where "the top [vertebrae] can be backwards in relationship to the bottom [vertebrae]."

{¶16} The two insurance authorization requests sought "L5-S1, TLIF, PSF" surgeries for both Ravenscraft and Bowling. A "TLIF" is a "transforaminal lumbar interbody fusion" of the L5-S1 joint, which involves fusing a spinal joint "in [a] . . . way that the two adjacent bones – in this case L5 and S1 [–] fuse." The bones "grow together, and they form one bony fusion." It is "a combination of two things," a

"pedicle screw" and "a rod that connects one level below," and "a bone graft" to replace the removed disc. Dr. Durrani also planned to perform a "laminectomy," which removes part of a vertebrae's "lamina" (the "roof of the canal") to relieve pressure.

A. *Ravenscraft*

i. Before surgery

{¶17} At trial, Ravenscraft first described her condition before seeing Dr. Durrani: shoulder, upper back, and hip pain that forced her to retire. Sitting "nine hours a day . . . really started to aggravate" her hip. After her right hip, thigh, and groin pain kept Ravenscraft up at night, her primary care physician referred her to Dr. Foad, a rheumatologist, in July 2012.

{¶18} Ravenscraft promptly met with Dr. Foad, complaining of pain in her right hip, thigh, and groin. A physical exam revealed tenderness in her right hip, back, and scapular area. Dr. Foad's notes reflected that she had "no pain in the left hip and . . . no pain in the lower back." Dr. Foad noted "off and on" pain in her surgically-repaired left knee. She also had pain in her "left scapular area," where she had undergone a cervical-fusion surgery nine years earlier "for stenosis and degenerative disc disease." Dr. Foad's treatment plan initially included medication and joint exercises, but the plan later pivoted to right-hip and right-lower-back injections. Ravenscraft described the therapeutic relief from those injections as fleeting: "from then on nothing seemed to work." In October 2012, Dr. Foad noted that, while her right hip, left neck, and scapular pain persisted, her "left hip [wa]s not painful."

{¶19} Dr. Foad ordered an MRI. The radiologist saw evidence on Ravenscraft's "L5-S1" joint of a "low-grade retrolisthesis and broad posterior disc protrusion eccentric left flattening left dural sac and posteriorly displacing the left S1 nerve root." That MRI led Dr. Foad to refer Ravenscraft to Dr. Durrani.

{¶20} On her CAST intake form, Ravenscraft identified increased pain in her right hip, groin, and thigh as the primary concern for her visit. On the diagram, she indicated burning or aching in her right thigh, stabbing pain in her right groin and hip, and burning or aching in the middle of her back. She rated her pain a five to seven on a scale of one to ten. Ravenscraft testified that she met with Dr. Durrani, who did not discuss her hip injections, intake form, or nonsurgical options. He did not ask her any questions. Although she had indicated on her intake form that she was a heavy smoker, Dr. Durrani did not discuss with her the effects of smoking on recovery from spinal-fusion surgery.

{¶21} Instead, Dr. Durrani showed Ravenscraft an x-ray, "pointed the disc out," and "said that he believed this was the cause of [your] pain . . . and that he could fix it." He told her that the roughly-one-hour procedure would consist of a small incision, and implanting a "little cage" as a "spacer" so the "nerves will not be pinched or irritated." He told Ravenscraft she would "have no pain" when she woke up.

{¶22} Dr. Durrani wrote to Dr. Foad that Ravenscraft was suffering from "lumber spinal stenosis [at the] $L_5$-$S_1$," "lumbar degenerative spondylolisthesis" at the $L_5$-$S_1$, "back pain with radicular pain in the $L_5$-$S_1$," "functional impairment," "anterolisthesis of $L_5$ on $S_1$," "[c]entral stenosis with lateral recess stenosis at the $L_5$-$S_1$," and "failure of conservative treatment for many months." But Ravenscraft testified that Dr. Durrani never told her of those diagnoses. While Dr. Durrani's letter to Dr. Foad referenced a physical exam, Ravenscraft said that he did not physically examine her; instead, he "never got out of the chair." Dr. Durrani also informed Dr. Foad that he scheduled "a lumbar foraminal injection at the $L_5$-$S_1$ level on the right side" for her. But Ravenscraft testified that she never received an injection.

{¶23} Dr. Durrani also wrote to Ravenscraft's primary-care physician following another visit, describing his discussion with Ravenscraft about the risks and benefits of the surgery, post-operative care, and rehabilitation. Ravenscraft testified that this discussion did not take place, though she did sign the informed-consent form. While the signed form stated that Dr. Durrani reviewed the risks of the surgery, Ravenscraft testified that he did not tell her about these risks.

ii.  After surgery

{¶24} When Ravenscraft woke up after her surgery, she had no pain. Roughly 30 minutes later, Ravenscraft walked across the room at the direction of Dr. Durrani and was able to walk out of the hospital without any pain. As the anesthesia wore off, her "right hip and right thigh and groin were hurting again."

{¶25} Two weeks after surgery, Dr. Durrani wrote to Ravenscraft's primary-care physician that she was "[d]oing very well" despite "complaining of some [tingling and pain sensations] in the right leg." He said he physically examined Ravenscraft, planned to "start her in physical therapy," and prescribed her medication to help with the pain. Dr. Durrani's post-operative note stated that Ravenscraft said she was "doing ok, still has pain goes from R hip down the leg to the calf." Ravenscraft testified that she was "not doing better" and that Dr. Durrani did not examine her. She "still had the pain going from [her] hip down the knee – down the thigh."

{¶26} Ravenscraft engaged in physical therapy at the CAST facility, twice a week, for either six weeks or six visits. She "stopped because [she] was still in pain" and the "physical therapy, if anything, was making it worse." Eventually, Ravenscraft underwent hip-replacement surgery, which fixed the problems that Dr. Durrani assured Ravenscraft he would fix with his spinal surgery.

iii.    Ravenscraft's experts

a)  Dr. Bloomfield

**{¶27}** Dr. Bloomfield, a board-certified neurosurgeon with decades of experience in practice, provided opinions about Dr. Durrani's medical treatment of Ravenscraft. He testified that Dr. Durrani could have seen that Ravenscraft suffered from "a hip problem and not a problem from the lumbar spine." Dr. Bloomfield determined that Dr. Durrani deviated from the standard of care by recommending lumbar spine surgery "that he should have known would not have helped her." Further, Dr. Durrani "violated the standard of care by operating on the wrong side, basically, the asymptomatic side." Dr. Bloomfield explained that Dr. Durrani breached "the standard of care for both, not having her undergo conservative therapy first before thinking of surgery, and . . . for performing an operation that was not going to help her and not medically indicated." Finally, he testified that Dr. Durrani likely caused "her pain in her right leg [to] expand[] down into the calf" after it was "irritat[ed] at the time of the surgery."

**{¶28}** Dr. Bloomfield testified that Dr. Durrani fabricated ailments, exaggerated issues, and misrepresented the results of the MRI scan in his letter to Ravenscraft's doctor, and likely to Ravenscraft herself. Dr. Durrani identified "lumbar spinal stenosis L5-S1 that did not exist; lumbar degenerative spondylolisthesis that did not exist." While Dr. Durrani noted "central stenosis with lateral recess stenosis L5-S1," Dr. Bloomfield testified that "[t]here was no central stenosis seen on the MRI scan or in the radiology report." Dr. Durrani found back pain in Ravenscraft's L5-S1 distribution, but that pain did not exist. Dr. Bloomfield explained that Ravenscraft complained of pain in her right hip and right thigh, and a pinched S1 nerve root will cause "pain going down the back of the left leg all the way to the sole of the foot and

little toe." Ravenscraft's "MRI scan didn't show anything on the right side that could explain the problem." Instead, "[i]t was just pathology on the left side, and that was asymptomatic."

b) Dr. Saini

{¶29} Dr. Saini, a neuroradiologist, specializes in brain, spinal cord, head, neck, eye, and ear imaging. He is also board certified in diagnostic radiology.

{¶30} In Ravenscraft's imaging, Dr. Saini saw evidence of "degenerative disc disease at just about all levels." But, Dr. Saini explained, Dr. Durrani made no attempt to assess her stability. Dr. Saini testified that Dr. Durrani's reading of the radiology imaging fell below the standard of care and the radiology did not support Dr. Durrani's diagnoses of bilateral foraminal stenosis or degenerative spondylolisthesis on the right side. Dr. Saini "just d[id]n't see" severe narrowing and impingement of Ravenscraft's central canal around the L1 level. There was "no stenosis there" and "definitely not Grade-1 spondylolisthesis." Rather, Dr. Saini interpreted the narrowing of Ravenscraft's central canal as "an element of central foraminal stenosis at L4-5."

{¶31} After reviewing post-surgery imaging of Ravenscraft's back, Dr. Saini concluded that Dr. Durrani performed "the wrong type of surgery . . . for a disc protrusion or herniation." Indeed, Dr. Saini testified that fusing Ravenscraft's spine "probably made [her] condition [] worse" from a neuroradiologic perspective.

iv. Defense experts

a) Dr. Purcell

{¶32} Dr. Purcell, a neuroradiologist and board-certified diagnostic radiologist, testified in Dr. Durrani's defense. He reviewed Ravenscraft's imaging and discussed Dr. Durrani's diagnostic interpretations of the films.

{¶33} Dr. Purcell agreed with Dr. Durrani's diagnosis of lumbar spinal stenosis at L5-S1 and lumbar degenerative spondylolisthesis at L5-S1. But he disagreed with Dr. Durrani's diagnosis of the anterolisthesis of L5-S1 and instead believed it was retrolisthesis. Dr. Purcell agreed that there was central stenosis with lateral recess stenosis at L5-S1. Dr. Purcell had seen patients with Ravenscraft's pathology undergo surgery to address these issues.

b) Dr. Kaloostian

{¶34} Dr. Kaloostian, a neurosurgeon whose private practice entails "both surgical and nonsurgical management of patients with brain problems, spinal problems," testified in the Durrani parties' defense.

{¶35} According to Dr. Kaloostian, the fusion surgery that Dr. Durrani performed was "absolutely" an appropriate procedure to treat Ravenscraft's symptoms. He testified that Dr. Durrani's interpretation of the MRI met the applicable standard of care for a spine surgeon. Dr. Kaloostian opined that Ravenscraft's informed-consent form did not fall below the standard of care due to the use of abbreviations. He also explained that, "[q]uite clearly, as based on the postoperative notes of Dr. Durrani and the physical therapist, [Ravenscraft's] radicular pain improved or resolved," and the surgery was successful.

{¶36} Dr. Kaloostian considered the differences between Ravenscraft's intake form and Dr. Durrani's notes unremarkable because "[s]ometimes patients don't always list everything that's bothering them." After reviewing her medical records, Dr. Kaloostian concluded that Ravenscraft had a functional impairment "in the back and the right leg." He agreed with most of Dr. Durrani's impressions but disagreed that there was an "[a]nterolisthesis at L5 on S1" because he saw the slippage as "retro, L5 is going posteriorly, or to the back."

{¶37} Dr. Kaloostian agreed with Dr. Durrani's opinions and interpretation of the imaging studies and testified that Dr. Durrani's review met the standard of care and was "appropriate," "fair," and "accurate." Dr. Kaloostian deemed the surgery "[o]ne hundred percent" appropriate and conservative care unnecessary "because so much has already been done already." Dr. Kloostian testified that the medical evidence "all point[ed] to the L5 region, L5-S1 region as a potential pain generator."

B. *Bowling*[2]

    i. Before surgery

{¶38} Bowling's testimony and medical records revealed a steady stream of medical issues and treatments throughout her life. She struggled with obesity, high blood pressure, diabetes, thyroid disease, osteoarthritis, and depression, and had survived cancer. Bowling had undergone several surgeries before meeting Dr. Durrani, including a mastectomy, a removal of a tumor on her back, a laminectomy sometime around 2002, and rotator cuff surgery.

{¶39} Bowling had an MRI in June 2010 for "mild to moderate" back pain she had experienced for nearly a decade. In his notes, Bowling's nurse practitioner noted that her pain extended in an "L5 distribution, but also affecting her right leg in the form of tingling but to a lesser degree." An earlier MRI had revealed "degenerative disk disease and degenerative joint disease," with bursitis in her left hip. Bowling underwent physical therapy and an orthopedic evaluation of her left hip. Days later, Bowling met with another doctor who planned epidural steroid injections, physical therapy, and pain medication.

---

[2] Bowling did not testify live; instead, her deposition testimony was read to the jury.

{¶40} A radiologist who interpreted Bowling's October 2011 MRI saw evidence of "[m]oderate degenerative disc changes at L3-L4 through L5-S1," "central and foraminal stenosis," and "progression of the disease since June 29, 2010." Bowling went to see Dr. Skidmore at the Mayfield Spine Institute that same month. Dr. Skidmore reviewed the MRI and saw evidence of "Lumbar Spondylosis and Degenerative Disc Disease," which did not require surgery. Instead, he recommended "physical therapy and epidural steroid injections for non-surgical treatment of her symptoms." Those injections provided some relief and reduced her pain from a "7/10" to "2/10." In December 2011, Bowling had a "[t]herapeutic lumbar discography at L1-2, L2-3, and L3-4 levels." This revealed "partial-thickness posterior annular tear[s]" at the L1-2 and L2-3 levels, and "a full-thickness posterior annular tear."

{¶41} Bowling visited Dr. Durrani at CAST in September 2012. Her intake form indicated that she had experienced "severe back pain" for "9 years and it has gotten worse." Bowling denied writing that. And although her intake form identified pain extending down her left leg, Bowling testified that she did not have leg pain and did not write that on her intake form. Instead, she was experiencing pins and needles in her shoulder and severe sharp lower back pain. She testified, and her intake form reveals, that she rated her lower back pain an eight out of ten. Bowling reported on her intake form that she needed assistance walking, standing, lifting objects, dressing, shopping, and with housework.

{¶42} According to Bowling, Dr. Durrani told her that "he knew exactly what was wrong with me and he could fix it." Dr. Durrani did not discuss or review her MRIs during their visit. Dr. Durrani did, however, discuss surgery and warned Bowling that she would be "in a wheelchair if [she] didn't have the surgery." During their ten-minute

conversation, Durrani did not discuss with Bowling any non-surgical options, the ins and outs of the procedure, or the risks and benefits of the surgery.

{¶43} After her visit, Dr. Durrani wrote to Bowling's physician about his physical examination of Bowling. He wrote that "[f]orward flexion is painful" and that Bowling "ha[d] a positive SLR on the right and left side," "a positive Lasegue test on the left side," and "L5 sensory paresthesia." Dr. Durrani determined that Bowling had "[l]umbar degenerative disk disease" at L5-S1, "[l]umbar degenerative spondylolisthesis" at the L5-S1, and "[s]egmental instability [at the] L5-S1." He saw "clear evidence of neurogenic claudication and lumbar radiculopathy."

{¶44} After another MRI, Dr. Durrani sent a follow-up letter to Bowling's physician diagnosing her with "lumbar spinal stenosis at L3-L4, L4-L5 which is moderate to severe," "bilateral foraminal stenosis at L4-5," and "grade 1 listhesis of L5 on S1 with left foraminal stenosis at the L5-S1 level." Citing her lumbar spinal stenosis, Dr. Durrani planned to "do a lumbar laminectomy, decompression at L3-L4 and L4-L5 and left sided TLIF at L5-S1." Dr. Durrani scheduled Bowling for "L5-S1 transforaminal lumbar interbody fusion, posterior spinal fusion," and "B L3-4, L4-5 laminectomy foraminotomy and decompression." Bowling saw Dr. Durrani briefly on the day of the surgery and he repeated that he could fix what was wrong with her back.

ii.   After surgery

{¶45} Bowling recalled seeing Dr. Durrani at a visit a month after surgery. She explained that Dr. Durrani did not recommend physical therapy, but she would not have participated in physical therapy even if he had recommended it.

{¶46} Dr. Durrani wrote to her physician after the post-surgery visit, reporting that he had recommended Bowling engage in physical therapy. Dr. Durrani said Bowling was "doing very well" and "already doing pretty good."

16

**{¶47}** Bowling, however, testified that after her surgery, she experienced "severe" back pain, roughly an eight or nine out of ten. A Post-it note attached to Dr. Durrani's physical therapy recommendation stated that Bowling was in "too much pain" and did not want physical therapy.

**{¶48}** Bowling never went to physical therapy. Instead, she visited her doctor, a therapist, a chiropractor, and then the Mayfield Clinic in the ensuing months for persistent back pain. Her chiropractor's notes revealed that her pain had spread to both legs following the surgery. Her doctor wrote in 2013 that Bowling still had back pain and "[t]he operation did not make the back feel any better." He saw evidence of a "nonunion." Eventually, Bowling had a spinal cord stimulator implanted, but that "didn't help at all." As of trial, her back issues rendered her unable to walk.

   iii.   Bowling's experts

      a)  Dr. Bloomfield

**{¶49}** Dr. Bloomfield testified that the "L5-S1 surgery could not have helped [Bowling]" because her pain was caused by "the upper levels." And Bowling could not have consented to a procedure that was unnecessary to treat her problem. The surgery Dr. Durrani performed on Bowling was not medically indicated, so the risks were not justified "whatsoever." Dr. Bloomfield testified that Dr. Durrani's surgery worsened Bowling's existing conditions. Moreover, Dr. Durrani did not perform a laminectomy on the upper levels, which Bloomfield testified could have helped Bowling.

**{¶50}** Dr. Bloomfield agreed that Bowling had moderate-to-severe lumbar spinal stenosis at the L3-4 and L4-5 levels, a bilateral foraminal stenosis at L4-5 level, and a grade-1 listhesis of L5-S1 with left foraminal stenosis at the L5-S1 level. But he disagreed that there was instability. Dr. Bloomfield testified that Dr. Durrani performed the L5-S1 fusion surgery "within the standard of care technically."

b) Dr. Wilkey

**{¶51}** Dr. Wilkey was an orthopedic spine surgeon, though at the time of trial he worked for United Healthcare as a "utilization management physician" reviewing requests for neurosurgery, spine surgery, and orthopedic surgery. While Dr. Wilkey was performing spinal surgery "a hundred percent" of the time when Bowling had her surgery, he had not performed a spinal surgery during the two years before the trial.

**{¶52}** Dr. Wilkey testified that Bowling "did not need the surgery [Dr. Durrani performed] and it was improperly performed." He criticized Dr. Durrani's diagnoses, informed-consent form, and his lack of an operating note.

**{¶53}** Dr. Wilkey questioned Dr. Durrani's ability to diagnose Bowling with lumbar degenerative spondylolisthesis L5-S1 because of the poor quality of the film. He disagreed with Dr. Durrani's finding of "segmental instability L5-S1 with a one-tenth millimeter instability" because there was "no flexion and extension views" on the film. He also testified that Bowling had "no discernible central stenosis." Dr. Wilkey believed that Dr. Durrani had diagnosed Bowling with spondylolisthesis and neurogenic claudication "to get insurance approval."

**{¶54}** Dr. Wilkey opined that Bowling had mild "degenerative disc disease and a little bit of bulging and a little bit of arthritis." While Dr. Wilkey agreed with Dr. Durrani that Bowling had "mild to moderate stenosis at L3-4" based on her MRI, he disagreed that there was "bilateral foraminal stenosis at L4-5." Dr. Wilkey explained that the S1 vertebrae controls the left ankle reflex and the L5 vertebrae controls the foot more than the back. And Bowling testified that she had no leg pain, which was consistent with her diagnoses before she met Dr. Durrani.

**{¶55}** Dr. Wilkey criticized Dr. Durrani's failure to coordinate or pursue conservative treatment options with Bowling. He pointed out that Dr. Durrani ordered

18

an MRI and requested surgery on the same day, which implied that, "[n]o matter what, he's already off to surgery."

{¶56} Turning to Bowling's informed consent, Dr. Wilkey found the consent form used by Dr. Durrani inappropriate due to the frequent use of abbreviations, likening the form's content to "Morse Code." So, Dr. Wilkey testified, the informed-consent form fell below the standard of care. And he found no evidence that Dr. Durrani explained the risks and benefits of the surgery.

{¶57} Dr. Wilkey believed that Bowling's surgery did not address the cause of her pain, which Dr. Wilkey identified as Bowling's L1-2, L2-3, and L3-4 joints. Plus, Dr. Durrani used the "Baxano" technique, which Dr. Wilkey described as "an extra procedure that was not needed and caused harm." Dr. Wilkey believed Dr. Durrani used the "Baxano technique" because he could "charge for it."

{¶58} Dr. Wilkey reviewed the post-surgery imaging and testified that he saw a "malpositioned . . . right L5 [pedicle] screw" touching Bowling's nerve root. He explained that this likely caused Bowling's right leg pain, which flared up after the surgery. And Bowling's severe left leg pain was "probably a postoperative complication from either the Baxano" or the graft, which likely "irritated the nerve root there."

{¶59} Dr. Wilkey was not surprised that Bowling did not engage in physical therapy after her surgery because of the pain caused by Dr. Durrani's needless surgery.

c) Dr. Saini

{¶60} Dr. Saini testified that Dr. Durrani's reading of the radiology breached the standard of care and caused Bowling to have unnecessary surgery. Her "disease was far greater and far worse at L3-4, at L4-5[,] than it was on [L]5-S1" but "Dr. Durrani never operated on [those vertebrae]." Dr. Saini agreed that the surgery "wasn't done correctly" because of an "improperly placed" screw.

{¶61} Dr. Saini disagreed with Dr. Durrani's interpretation of Bowling's x-rays and MRI film. He saw no indication of lumbar instability and pointed to Dr. Durrani's radiologist's interpretation of Bowling's MRI, which made no mention of "actual slippage of L5 on S1." Plus, there was nothing to implicate the L5 distribution on Bowling's intake form. Instead, Dr. Saini believed that it was "either S1 or S2 backside" causing Bowling's back pain. And based on the film, Dr. Saini testified that L4-5 had "more significant disease" than L5-S1, "but Dr. Durrani never addresse[d] that." Dr. Durrani only attempted "to look at [] L5-S1, but . . . [it] looks like it's the best out of all the levels."

{¶62} Dr. Saini critiqued the informed-consent form, explaining that Bowling and any other patient would not understand what "left L5-S1 TLIF, posterior spinal fusion, bilateral L4-4" means. He explained that an informed-consent form should explain "what you're getting yourself into," alternatives, the chance of success, and the risks, complications, and rewards. But looking at Bowling's form, "[t]here's no way . . . [Bowling] would know what she's getting herself into."

{¶63} Turning to Bowling's post-operation imaging, Dr. Saini found that Dr. Durrani implanted the pedicle screw in Bowling's spine incorrectly. While Dr. Durrani claimed to have performed a laminectomy at L3-L4 and L4-L5, he "didn't do anything" and "the lamina" and "spinous process" should have been removed during the laminectomy, "but they are still there."

iv.    Defense experts

a)    Dr. Purcell

{¶64} Dr. Purcell noted that a patient's weight "can influence alignment and the appearance of discs." According to Dr. Purcell, Dr. Durrani did not fabricate the presence of a listhesis. He agreed with Dr. Durrani's impression that Bowling had

"lumbar spinal stenosis L4-5, L3-4 and L5-S1" and with Dr. Durrani's diagnosis of a bilateral lumbar foraminal stenosis bilateral at L3-L4, L4-L5 and left sided L5-S1. Dr. Purcell further agreed with Dr. Durrani that Bowling had a grade-1 anterolisthesis of L5 on S1. But Dr. Purcell agreed with Drs. Bloomfield and Saini that Dr. Durrani had not performed surgery on Bowling's L4-5 and L3-4 vertebral joints.

**{¶65}** Dr. Purcell had seen patients with Bowling's pathology that underwent surgery, though some had less invasive procedures. Dr. Purcell saw no evidence of a mispositioned pedicle screw following Bowling's L5-S1 fusion.

b) Dr. Kaloostian

**{¶66}** Dr. Kaloostian testified that Dr. Durrani's surgical technique met the standard of care during Bowling's surgery and saw no evidence of a "malposition[ed]" pedicle screw. He explained that Bowling's post-surgical pain was not unusual and the surgery did not cause Bowling's subsequent right leg pain.

**{¶67}** Dr. Kaloostian testified that physical therapy is necessary to loosen and strengthen muscles.

**{¶68}** Regarding Bowling's informed-consent form, Dr. Kloostian testified that the abbreviations on the form were appropriate. Further, oral informed consent is acceptable in Ohio. So, Dr. Durrani received Bowling's informed consent "twice."

**{¶69}** Finally, Dr. Kaloostian testified that Dr. Durrani appropriately narrowed the scope of the surgery and did not perform procedures other than the L5-S1 procedure.

C. *Dr. Tayeb*

**{¶70}** Dr. Tayeb testified over Dr. Durrani's objection. He was "an interventional spine and pain specialist" who worked as "the conservative or spinal interventionist" with Dr. Durrani at CAST for three years. While not a spinal surgeon,

Dr. Tayeb helped direct CAST's rehabilitation program and did "therapeutic spinal injections and other musculoskeletal procedures."

{¶71} Dr. Tayeb did not provide testimony specific to Ravenscraft or Bowling. Instead, he recalled that another CAST physician, Dr. Shanti, had described Dr. Durrani as "[o]veraggressive" with his surgical indications and Dr. Durrani recommended surgery for "a good percentage of his patients." Dr. Tayeb saw "firsthand" Dr. Durrani describe a "mild or moderate" issue "as something as moderate to severe." Dr. Tayeb was not surprised that Dr. Durrani told patients that he would fix them "[b]ecause that was a . . . common phrase that . . . we used to hear." Dr. Tayeb recalled shadowing Dr. Durrani and hearing him assure patients that he could "fix" them. Dr. Tayeb also heard Dr. Durrani tell patients "here and there" that, without the recommended surgery, the patients risked permanent paralysis.

### *Jury instructions*

{¶72} The Durrani parties requested a comparative-negligence jury instruction for Bowling, citing her lack of attempt to engage in physical therapy. The trial court did not give that requested instruction.

{¶73} The trial court did instruct the jury to give "fair consideration as to each plaintiff's claim" individually and explained that its instructions "govern the case as to each individual." While the trial court's instructions referred to Ravenscraft and Bowling collectively as the "plaintiffs," the jury was told to analyze "each individual plaintiff and their individual claims."

{¶74} The trial court also instructed the jury to avoid speculating about Dr. Durrani's absence and avoid "consider[ing] his absence for any purpose except as instructed." Dr. Durrani "voluntarily left the jurisdiction, removing himself from the plaintiffs' ability to subpoena him to trial." And when a party "has relevant evidence

or testimony within his or her control and the party fails to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party." And earlier, the trial court had instructed the jury that determining "[w]hether an inference is made rests entirely with you."

### *The jury found the defendants liable for both patients' injuries and awarded compensatory and punitive damages*

**{¶75}** The jury found the Durrani parties liable for negligence, failing to acquire informed consent, and fraudulently misrepresenting the necessity of the surgery for both Ravenscraft and Bowling. For Ravenscraft, the jury specified that "Dr. Durrani, misdiagnosed Ms. Ravenscraft. The defendant should have investigated her hip pain to determine whether her pain was coming from her hip or her lower back. Breached the standard of care." For Bowling, the jury found that "Dr. Durrani was found negligent as to Arletta Bowling because the TLIF surgery was not medically indicated. His reading of the MRI and his findings/impressions were outside the standard of care. The absence of the operative note is negligent."

**{¶76}** The jury awarded Ravenscraft $481,618.21 in compensatory damages. It awarded Bowling $595,700 in compensatory damages. And it awarded both Bowling and Ravenscraft $6,000,000 in punitive damages and attorney fees. The trial court reduced those damages awards, lowering Ravenscraft's compensatory damages to $250,000 and punitive damages to $503,236.42, and Bowling's compensatory damages to $595,00 and punitive damages to $501,520.

### *Post-trial motions*

**{¶77}** In 2022, the Durrani parties moved, in each case, for a new trial under Civ.R. 59 and a judgment notwithstanding the verdict under Civ.R. 50(B). The Durrani parties argued that the trial court's adverse-inference instruction permitted the jury to

find them liable solely based on Dr. Durrani's absence from trial and failed to inform the jury that it "may" make an inference based on his absence. Specific to Bowling, the Durrani parties argued that Wilkey's testimony was inadmissible under Evid.R. 601(B) because he had not been employed as a spine surgeon at the time of trial and that the trial court erred when it refused to instruct the jury on comparative negligence.

{¶78} The trial court denied the Durrani parties' motions. Beginning with the requested comparative-negligence instruction, the trial court found that Dr. Durrani did not instruct his patients to engage in physical therapy. Instead, he only recommended it. Plus, the Durrani parties produced no evidence showing that Dr. Durrani told Bowling her surgery's success depended on her completion of physical therapy. Next, the trial court determined that the instruction was proper. Finally, turning to Dr. Wilkey, the trial court cited Dr. Wilkey's testimony that the Covid-19 pandemic halted elective surgeries and, "but for the pandemic," Dr. Wilkey would have satisfied Evid.R. 601(B)'s active-clinical-practice requirement at the time of trial, and Dr. Durrani's flight from the country caused "serious[] delay in this case."

{¶79} In 2024, the Durrani parties filed new memoranda supplementing their Civ.R. 59 and Civ.R. 50(B) motions in each case. The Durrani parties argued that this court's decisions in *Hounchell v. Durrani*, 2023-Ohio-2501 (1st Dist.), and *Densler v. Durrani,* 2014-Ohio-14 (1st Dist.), supported their objection to Dr. Tayeb's testimony at trial. But the trial court found those cases distinguishable and rejected the motions.

## II.   *Analysis*

{¶80} On appeal, the Durrani parties challenge several of the trial court's procedural and evidentiary decisions in four assignments of error. First, they claim the trial court should have ordered separate trials for Ravenscraft and Bowling. Second, they argue that the trial court erred when it denied their motions for judgments

24

notwithstanding the verdicts or a new trial. Third, they maintain that Dr. Saini testified beyond his expertise in violation of Evid.R. 702. Finally, they contend that the trial court should have given "many interrogatories" under Civ.R. 49.

### *Common questions of law and fact permit a joint trial*

{¶81} In their first assignment of error, the Durrani parties argue that the trial court erred when it jointly tried Ravenscraft's and Bowling's cases. First, they claim that the joint trial was improper due to differences in the patients' histories, experiences with Dr. Durrani, and recovery. Second, they argue that *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), was wrongly decided and should be overturned.

{¶82} We review the trial court's decision to order joint trials for an abuse of discretion. *Jones* at ¶ 20, citing *Siuda v. Howard,* 2002-Ohio-2292, ¶ 10 (1st Dist.). A trial court abuses its discretion when it "exercise[es] its judgment[] in an unwarranted way." *Johnson v. Abdullah,* 2021-Ohio-3304, ¶ 35.

{¶83} Under Civ.R. 42(A)(1)(a), actions that "involve common questions of law or fact" may be joined for trial on "any or all matters at issue in the actions." The trial court's authority to order a joint trial reflects several equitable principles, including reducing inconvenience and cost to the parties, and preventing "multiplicity of actions." *See* 1970 Staff Note, Civ.R. 42; *see also Dir. of Hwys. v. Kleines*, 38 Ohio St.2d 317, 319 (1974) ("The purpose of the rule is 'to avoid unnecessary costs or delay' in the interests of judicial efficiency."). Though the unfair prejudicial effect of joining trials is relevant to the inquiry, the mere possibility of prejudice will not justify a reversal of the trial court's decision to order a joint trial. *Courtney v. Durrani,* 2025-Ohio-2335, ¶ 57 (1st Dist.). Separate trials, in contrast, are appropriately ordered under Civ.R. 42(B) where separating actions will convenience the parties, avoid prejudice, expedite the resolution of the matter, or further judicial economy.

**{¶84}** While the trial court must base its decision to order joint trials on a finding of common questions of law or fact, "Civ.R. 42(A) does not require that all questions of law and fact be identical." *Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.). Joint trials may be appropriate despite the presence of "separate components or [] distinct factual or legal issues." *Courtney* at ¶ 48, citing *Clemente v. Gardner,* 2004-Ohio-2254, ¶ 18 (5th Dist.).

**{¶85}** In *Jones*, we affirmed the trial court's decision to order joint trials because common questions of fact predominated the case. *Jones* at ¶ 25. Specifically, "the jury's understanding of the specific conditions at issue in the L5-S1 area of the spine was pertinent and predominated in both cases," and expert testimony focused on spinal anatomy, Dr. Durrani's diagnoses, and "what would need to be present in a patient's imaging to warrant such representations." *Jones* at ¶ 25. Plus, the *Jones* plaintiffs raised "the same claims against the same defendants based on the same theory of malpractice and/or fraud surrounding these conditions." *Id.*

**{¶86}** In *Courtney,* we cited *Jones* to affirm the trial court's decision to order joint trials because both plaintiffs "had similar diagnoses[,] received essentially the same surgery," raised claims that Dr. Durrani "made medically incorrect impressions of their images to order and perform" unnecessary surgeries, and relied on experts to explain "how the spine functions, the complexities of their conditions, and the surgeries [Dr.] Durrani performed." *Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.).

**{¶87}** Here, the Durrani parties did not request, and the trial court did not make, findings of common questions of fact or law in support of its decision to order joint trials. While articulating findings would be best practice and allow for a more meaningful review, Civ.R. 42(A) does not mandate findings and "the trial court's exercise of its discretion will be affirmed if it exhibits a sound reasoning process that

would support its decision." *Viox v. Weinberg*, 2006-Ohio-5075, ¶ 25 (1st Dist.). And *Jones* and *Courtney* constitute binding precedent that the trial court, and this court, must follow. Based on that precedent, the trial court did not abuse its discretion by ordering a joint trial for the two patients.

**{¶88}** Both patients advanced negligence, fraudulent-misrepresentation, and informed-consent claims. Dr. Durrani assured both Ravenscraft and Bowling that he could "fix" their ailments and diagnosed both with degenerative disc disease, spinal stenosis, and degenerative spondylolisthesis at the L5-S1 joint. The expert testimony focused on the presence or absence of any symptoms traceable to the L5-S1 joint. The Durrani parties' expert testified that Dr. Durrani performed identical surgeries on Bowling and Ravenscraft. Dr. Durrani used the same informed-consent form for Ravenscraft and Bowling, and the experts testified about the propriety of abbreviations and lack of details regarding the risks of the surgery.

**{¶89}** The Durrani parties claim that the joint trial prejudiced them because Ravenscraft and Bowling each gained strategic advantages due to improper inferences raised, and confusion sowed, by evidence of the other's medical history, diagnosis, surgical procedure, and recovery.

**{¶90}** But the trial court instructed the jury to assess each plaintiff's claims on their own merits, and "[w]e presume the jury followed that instruction." *Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.). And the jury returned different compensatory and actual damages awards for Ravenscraft and Bowling, suggesting that the jury differentiated Ravenscraft's and Bowling's experiences. While the jury awarded Ravenscraft and Bowling identical punitive damages awards, punitive damages are meant to "'punish and deter certain conduct.'" *Sivit v. Village Green of Beachwood, L.P.*, 2015-Ohio-1193, ¶ 7, quoting *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651 (1994).

Identical punitive damages awards are unremarkable because the propriety of Dr. Durrani's conduct—his representations, diagnoses, and informed-consent forms—was a common issue of fact for both patients.

**{¶91}** The Durrani parties also argue that this court's opinion in *Jones* should be overturned. We rejected this exact argument in *Courtney*. *See Courtney*, 2025-Ohio-2335, at ¶ 50-52 (1st Dist.).

**{¶92}** Because the trial court did not abuse its discretion when it ordered a joint trial for Ravenscraft and Bowling, we overrule the first assignment of error.

### *No reversible error in the trial court's denial of the Durrani parties' post-trial motions*

**{¶93}** In their second assignment of error, the Durrani parties contend that the trial court should have granted their motions for judgments notwithstanding the verdicts and a new trial due to a host of evidentiary and jury-instruction issues.

**{¶94}** Under Civ.R. 50(B)(1), a party may move for a judgment notwithstanding the verdict after the trial court enters judgment on the jury's verdict. Moving for judgment notwithstanding the verdict challenges "the legal sufficiency of the evidence." *Alonso v. Thomas*, 2021-Ohio-341, ¶ 55 (9th Dist.). Indeed, "[a] motion for judgment notwithstanding the verdict is used to determine only one issue: whether the evidence is totally insufficient to support the verdict." (Citations omitted.) *Grieser v. Janis,* 2017-Ohio-8896, ¶ 15 (10th Dist.). The Durrani parties fail to articulate an argument challenging the sufficiency of Ravenscraft's or Bowling's evidence. We "will not create an argument in support of an assignment of error where an appellant fails to develop one." *Fontain v. Sandhu*, 2021-Ohio-2750, ¶ 15 (1st Dist.).

**{¶95}** Moving on, a trial court may grant a motion for a new trial under Civ.R 59(A) for a variety of reasons, including an "[e]rror of law occurring at the trial and

brought to the attention of the trial court by the party making the application" or "for good cause shown." Civ.R. 59(A)(9). The scope of our review turns on the argument advanced in the motion for a new trial. *Berardo v. Felderman-Swearingen,* 2020-Ohio-4271, ¶ 7 (1st Dist.). We review a trial court's exercise of its discretionary authority under an "abuse-of-discretion standard of review and will reverse only where the ruling was unreasonable, arbitrary, or unconscionable." *Adams v. Durrani*, 2022-Ohio-60, ¶ 20 (1st Dist.). Of course, "no court has the authority, within its discretion, to commit an error of law." *Wildenthaler v. Galion Community Hosp.,* 2019-Ohio-4951, ¶ 26 (10th Dist.). So, where a motion for a new trial raises a legal issue, our standard of review is de novo. *Williams v. Sharon Woods Collision Ctr., Inc.*, 2018-Ohio-2733, ¶ 28 (1st Dist.).

## A. *Admitting Dr. Tayeb's testimony was harmless error*

**{¶96}** The Durrani parties argue that the trial court abused its discretion when it admitted Dr. Tayeb's testimony, which was comprised of hearsay statements, improper habit and character evidence, and was prejudicial to Dr. Durrani. They take issue with two portions of Dr. Tayeb's testimony. First, Dr. Tayeb testified that when he was shadowing Dr. Durrani, he heard Dr. Durrani tell patients, "here and there," that they could be paralyzed without the recommended surgery. Second, Dr. Tayeb recalled that Dr. Shanti, another CAST physician, had described Dr. Durrani "[]as significantly more on the aggressive end [of the spectrum when making surgical indications]," if not "[o]veraggressive."

### i.  Evidentiary decisions must be prejudicial to justify reversal

**{¶97}** We review the trial court's evidentiary decisions, including its decision to admit or exclude Dr. Tayeb's testimony, for an abuse of discretion. *Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 27 (1st Dist.). But ""[a]n improper evidentiary ruling

constitutes reversible error only when the error affects the substantial rights of the adverse party or the ruling is inconsistent with substantial justice.""" *Id.* at ¶ 78, quoting *Setters v. Durrani*, 2020-Ohio-6859, ¶ 22 (1st Dist.), quoting *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 35. To determine whether an erroneous evidentiary ruling is harmless, "'a reviewing court must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred.'" *Stephenson* at ¶ 78, quoting *Setters* at ¶ 22.

      ii.    <u>Some of Dr. Tayeb's testimony should not have been admitted</u>

**{¶98}** This appeal is not the first time this court has considered the propriety of Dr. Tayeb's testimony. *See Stephenson* at ¶ 27-37; *see also Densler v. Durrani*, 2024-Ohio-14, ¶ 16-20 (1st Dist.); *Bender v. Durrani*, 2024-Ohio-1258, ¶ 74-79 (1st Dist.); *Courtney*, 2025-Ohio-2335, at ¶ 62-68 (1st Dist.).

**{¶99}** In *Stephenson*, Dr. Tayeb recalled hearing "'here and there,' that Dr. Durrani would tell patients things like 'their heads would fall off' or 'they would be paralyzed' if they declined to undergo the surgeries he recommended." *Stephenson* at ¶ 34. We held that the trial court "abused its discretion in admitting Dr. Tayeb's testimony" without establishing a proper foundation of Dr. Durrani's alleged habitual statements. *Id.* at ¶ 37. We reasoned that "here and there" is "remarkably vague about the frequencies of the occurrences of these comments." *Id.* And Dr. Tayeb's testimony was unclear regarding both "the particular stimulus that evoked the alleged habitual response" and "whether Dr. Durrani always, typically, or just sometimes offered the warning about heads falling off." *Id.* Plus, there was evidence in the record that the trial court's admission prejudiced Dr. Durrani, as jurors cited "Dr. Tayeb's testimony that Dr. Durrani habitually told his patients their heads would fall off" in their interrogatories. *Id.* at ¶ 82.

{¶100} Then in *Densler,* we "h[e]ld that the trial court abused its discretion in admitting Dr. Tayeb's testimony for the same reasons provided in *Stephenson.*" *Densler* at ¶ 18. And the admission of Dr. Tayeb's testimony in *Densler* was not harmless "[b]ecause the record provides clear confirmation that the jury relied on the improperly admitted testimony when making its decision in this case." *Id.* at ¶ 20. Indeed, "Dr. Tayeb's testimony was the only testimony which established that Dr. Durrani told his patients that they would lose control of their bodily functions absent surgery" and the jury's punitive damages award was based on Dr. Durrani's statements to the plaintiff "'that he would be paralyzed without the surgery and lose control of bodily functions.'" *Id.*

{¶101} And in *Bender,* we addressed Dr. Tayeb's testimony that Dr. Shanti, "another CAST surgeon, had told Tayeb that Dr. Durrani's 'surgical indications' were 'significantly more on the aggressive end, if not over.'" *Bender*, 2024-Ohio-1258, at ¶ 74 (1st Dist.). We held that this testimony "was admissible under Evid.R. 804(B)(3), which permits hearsay testimony when the statement is contrary to a party's interest." *Id.* at ¶ 78. We explained that one "CAST doctor stating that another CAST doctor was overly aggressive was clearly against CAST's interest." *Id.*

{¶102} Finally, in *Courtney*, we held that Dr. Tayeb's "here and there" testimony was improper under *Stephenson* and *Densler*. *Courtney*, 2025-Ohio-2335, at ¶ 64 (1st Dist.). But the trial court's admission of this evidence in *Courtney* was harmless because there was no sign that the jury relied on Dr. Tayeb's testimony to reach its verdicts and "other testimony in the record supported the notion that Durrani minimized the risks of surgery." *Id.* at ¶ 65-67. Also, we relied on *Bender* to reject Dr. Durrani's hearsay challenge and reasoned that Dr. Tayeb's recitation of Dr. Shanti's opinion was admissible under Evid.R. 804(B)(3) because Dr. Shanti "was an agent of

party-defendant CAST." *Id*. at ¶ 68.

iii.     Any error in admitting Dr. Tayeb's testimony was harmless

**{¶103}** Beginning with Dr. Tayeb's testimony describing Dr. Durrani's habitual assurances to patients, we hold that the trial court erred under *Stephenson, Densler,* and *Courtney* when it allowed Dr. Tayeb to testify that Dr. Durrani told patients, "here and there," that Dr. Durrani's recommended surgery was necessary to avoid paralysis.

**{¶104}** The record in this case is more consistent with the record in *Courtney* than the records in *Stephenson* and *Densler*. And like in *Courtney*, we hold that Dr. Tayeb's "here and there" testimony was ultimately harmless.

**{¶105}** Dr. Durrani's habitual assurance was duplicative of the assurances described by Bowling and Ravenscraft. Bowling recalled Dr. Durrani telling her that he could fix her and that she would "be in a wheelchair" if she did not have the recommended surgery. Ravenscraft testified that Dr. Durrani identified the cause of her pain and assured Ravenscraft, "I can fix this for you." Moreover, unlike in *Stephenson* and *Densler,* nothing in the record shows that the jury relied on Dr. Tayeb's improperly admitted habit testimony.

**{¶106}** Moving to Dr. Tayeb's reference to Dr. Shanti's opinion, we see no reason to depart from our holdings in *Bender* and *Courtney*. This testimony was admissible under Evid.R. 804(B)(3) as a statement against CAST's interest.

**{¶107}** Therefore, while the trial court abused its discretion by admitting Dr. Tayeb's habit testimony, that error was harmless. But the trial court did not abuse its discretion by allowing Dr. Tayeb to describe Dr. Shanti's opinion of Dr. Durrani's aggressiveness in treating patients because that testimony was admissible as a statement against CAST's interest under Evid.R. 804(B)(3).

B. *Dr. Wilkey was an expert under the 2023 amendment to Evid.R. 601*

**{¶108}** Next, the Durrani parties argue that the trial court erred when it permitted Dr. Wilkey to testify because he did not qualify as an expert under Evid.R. 601, as he did not, at the time of trial, devote at least half of his time to active clinical practice or instruction at an accredited school.

**{¶109}** Under Evid.R. 601(B)(5), a person is disqualified from testifying as an expert on the issue of a physician's liability arising out of a medical claim unless that person meets three requirements. Relevant here, the witness must meet an "active-clinical-practice requirement" under Evid.R. 601(B)(5)(b). *See Johnson*, 2021-Ohio-3304, at ¶ 24. That requirement is satisfied if the witness "devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school." Evid.R. 601(B)(5)(b).

**{¶110}** When Dr. Wilkey testified in March 2022, former Evid.R. 601(B)(5)(b) required witnesses testifying as experts in medical cases to "meet the active-clinical-practice requirement of Evid.R. 601 at the time the testimony is offered at trial." *Johnson* at ¶ 20. Dr. Wilkey testified that he was performing orthopedic spine surgeries "until COVID did in the hospital." Indeed, he last performed spine surgery in July 2020. But when Bowling's surgery occurred in 2012, Dr. Wilkey devoted all of his professional time to performing spinal surgeries.

**{¶111}** The Durrani parties, citing the active-clinical-practice requirement, argue that Dr. Wilkey was not qualified to testify as an expert in Bowling's case. The trial court rejected that argument citing an exception to that rule recognized by the Supreme Court of Ohio in which a witness is competent under Evid.R. 601(B)(5)(b) "where the witness would have qualified as an expert but for defense continuances and a stay of proceedings resulting from the insolvency of a defendant's carrier." *Celmer v.*

*Rodgers*, 2007-Ohio-3697, ¶ 25. The parties dispute whether the *Celmer* exception applies, considering the Supreme Court of Ohio's opinion in *Johnson* that confined *Celmer* "to the particular facts of that case." *Johnson*, 2012-Ohio-3304, at ¶ 20.

**{¶112}** But we need not determine whether *Celmer* applies. As the Durrani parties recognize in their brief, Evid.R. 601 was amended in July 2023. Now, a witness is competent to testify as an expert in medical cases if they "devote[] at least one-half of [their] professional time to the active clinical practice in [their] field of licensure, or to its instruction in an accredited school, *at either the time the negligent act is alleged to have occurred or the date the claim accrued.*" (Emphasis added.) Evid.R. 601(B)(5)(b). The staff notes to the 2023 amendment explain that Evid.R. 601(B)(5)(b) was "amended to clarify the time at which the active clinical practice requirement is needed to qualify the witness as an expert witness, in response to the Supreme Court of Ohio's ruling in *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304."

**{¶113}** So, Dr. Wilkey's competence turns on whether the July 2023 amendment to Evid.R. 601(B)(5)(b) applies. We hold that it does. *See Courtney*, 2025-Ohio-2335, at ¶ 73-75 (1st Dist.). The amendment to Evid.R. 601 applies to "*all further proceedings in actions then pending*, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice." (Emphasis added.) Evid.R. 1102(B). The "construction of an evidentiary rule [] presents a question of law that we review de novo." *State v. Depew*, 136 Ohio App.3d 129, 132 (4th Dist. 1999). When interpreting court rules, the "general principles of statutory construction apply" and "we must read undefined words or phrases in context and then construe them according to rules of grammar and common usage." *State ex rel. Law Office of Montgomery Cty. Pub. Defender v.*

*Rosencrans*, 2006-Ohio-5793, ¶ 23. The word "proceeding" generally means "[t]he regular and orderly progression of a lawsuit," a "procedural means for seeking redress," and "[a]n act or step that is part of a larger action." *Black's Law Dictionary* (10th Ed. 2014). And ""an action or suit is 'pending' from its inception until the rendition of final judgment."" *Maynard v. Eaton Corp.,* 2008-Ohio-4542, ¶ 13, quoting *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 103 (1988), quoting *Black's Law Dictionary* (5th Ed. 1979).

**{¶114}** Former Evid.R. 601 was in effect during the trial, when the Durrani parties filed their post-judgment motion in May 2022, and when the trial court denied that motion in January 2023.

**{¶115}** But the case was still pending in July 2023, when the current version of Evid.R. 601 became effective. Indeed, it was still pending well after the amendment was enacted. In March 2024, the Durrani parties filed a supplemental memorandum in support of their post-trial motion, which the trial court denied in April 2024. The amendment applies to cases pending when it became effective. And there is no doubt that the actions were pending in July 2023.

**{¶116}** Moreover, the Durrani parties filed their appeal in April 2024. An "appeal" is "[a] *proceeding* undertaken to have a decision reconsidered by a higher authority." *Black's Law Dictionary* (8th Ed. 2004); *see State v. Jones*, 2024-Ohio-2719, ¶ 21 (Kennedy, J., concurring).

**{¶117}** The current version of Evid.R. 601(B)(5)(b) governs our analysis of Dr. Wilkey's qualifications to provide expert medical testimony. And Dr. Wilkey was qualified to testify under the current version of Evid.R. 601(B)(5)(b).

**{¶118}** We discern no injustice or impracticality in applying the amendment. In *Courtney*, we applied the July 2023 amendment to cases pending in the trial court

when current Evid.R. 601(B)(5)(b) took effect. *Courtney* at ¶ 74. We questioned the practicality of applying former Evid.R. 601(B)(5)(b) to the plaintiffs' trials because "Dr. Wilkey could clearly testify on remand in accordance with the now-applicable amended rule." *Id.* at ¶ 75. This, we explained, would "create such an absurd result." *Id.* So too here.

**{¶119}** Because Dr. Wilkey was performing surgery "one hundred percent" of the time when Dr. Durrani operated on Bowling in 2012, Dr. Wilkey satisfies Evid.R. 601(B)(5)(b)'s active-clinical-practice requirement. The trial court did not err when it found Dr. Wilkey competent to testify as an expert in Bowling's case.

C. *The evidence did not warrant a comparative-negligence jury instruction*

**{¶120}** Next, the Durrani parties argue that the trial court erred by not instructing the jury to determine whether Bowling was comparatively negligent for her injuries. We review the trial court's decision to grant or deny a proposed jury instruction for an abuse of discretion. *Hounchell*, 2023-Ohio-2501, at ¶ 65 (1st Dist.).

**{¶121}** A proposed "jury instruction is proper if it correctly states the law and if it applies in light of the evidence adduced in the case." *Viox*, 2006-Ohio-5075, at ¶ 13 (1st Dist.). When reviewing a proposed jury instruction, a reviewing court must "'determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'" *Id.,* quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

**{¶122}** In Ohio, contributory negligence is "recognized" as a defense in medical-malpractice cases. *Viox* at ¶ 13, quoting *Lambert v. Shearer*, 84 Ohio App.3d 266, 284 (10th Dist. 1992). If proven, contributory negligence "may serve to diminish recovery under comparative negligence principles." *Reeves v. Healy*, 2011-Ohio-1487, ¶ 70 (10th Dist.).

**{¶123}** To establish a patient's contributory negligence, the defendant physician must show that the patient "breached a duty, proximately causing her own injury." *Segedy v. Cardiothoracic & Vascular Surgery of Akron*, 2009-Ohio-2460, ¶ 61 (9th Dist.). The evidence must show that the plaintiff's conduct fell below the standard of ordinary care for her own well-being and "combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred." *Id.* at ¶ 61, quoting *Brinkmoeller v. Wilson*, 41 Ohio St.2d 223, 226 (1975).

**{¶124}** In some instances, a patient's disregard of physician's orders may constitute a breach of her duty to exercise reasonable care. *Viox*, 2006-Ohio-5075, at ¶ 13 (1st Dist.). Said differently, a patient may be contributorily negligent if the "'patient neglects to obey the reasonable instructions of the surgeon, and thereby contributes to the injury complained of.'" *Striff v. Luke Med. Practitioners, Inc.*, 2010-Ohio-6261, ¶ 57 (3d Dist.), quoting *Geiselman v. Scott*, 25 Ohio St. 86 (1874), paragraph one of the syllabus.

**{¶125}** The trial court rejected the Durrani parties' comparative-negligence-jury-instruction argument for three reasons. First, "Dr. Durrani *recommended* that Bowling engage in post-surgery physical therapy, he did not *require* [her] to complete post-surgery physical therapy." (Emphasis in original.) Second, Dr. Durrani failed to explain to Bowling her surgery's success "depended significantly on her completion of post-surgery physical therapy." Third, it explained that Bowling could not be deemed to have been contributorily negligent for not completing post-surgery physical therapy prescribed by the surgeon who recommended and performed unnecessary surgery.

**{¶126}** We agree with the trial court that the evidence fails to show that Dr. Durrani or CAST told Bowling that her post-surgical recovery turned on her

completion of physical therapy. For more than 150 years, Ohio courts have recognized that "[t]he information given by a surgeon to his patient concerning the nature of his malady, is a circumstance that should be considered in determining whether the patient, in disobeying the instructions of the surgeon, was guilty of contributory negligence or not." *Geiselman* at paragraph two of the syllabus.

**{¶127}** A defendant-physician raising contributory negligence must establish causation—the "contributory negligence of the patient must have been an active and efficient contributing cause of the injury that is the basis of the patient's claim." *Viox*, 2006-Ohio-5075, at ¶ 13 (1st Dist.). A note attached to Bowling's physical-therapy prescription notes that Bowling was "in too much pain" to engage in physical therapy. That note is consistent with her testimony that she experienced severe pain following her spinal surgery. Medical records show, and Bowling's experts testified, that her surgery resulted in a nonunion—her vertebrae failed to fuse. And Drs. Wilkey and Saini saw evidence in Bowling's post-surgery imaging of a mispositioned pedicle screw in Bowling's vertebrae.

**{¶128}** The Durrani parties' expert testified that it was not abnormal for Bowling to experience pain following her surgery. He testified, generally, that Dr. Durrani's physical-therapy recommendation was appropriate because physical therapy helps restore a patient's muscles back to health. And he explained that a patient who chooses not to engage in physical therapy after surgery risks stiffness and diminished strength. But Dr. Durrani's expert did not testify that Bowling's failure to attend physical therapy caused her injury.

**{¶129}** The trial court reasonably found that a rational juror would not conclude that Bowling's failure to complete physical therapy contributed to her injuries. The trial court did not abuse its discretion when it rejected the Durrani

38

parties' comparative-negligence jury instruction.

D. *The trial court's adverse-inference jury instruction does not warrant reversal*

**{¶130}** Finally, the Durrani parties challenge the trial court's jury instructions regarding Dr. Durrani's absence from the trial, arguing that the jurors were informed that Dr. Durrani's absence created an inference that he was negligent.

**{¶131}** In an appeal, "'[t]he question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.'" *Jones*, 2024-Ohio-1776, at ¶ 29 (1st Dist.), quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron,* 2015-Ohio-229, ¶ 22. We must "'"consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'"'" *Id.* at ¶ 36, quoting *Cromer* at ¶ 35, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).

**{¶132}** This court has recognized that a jury may draw an unfavorable inference against a party "'who has control of the evidence in question'" and "'fails, without satisfactory explanation, to provide the evidence.'" *Roetenberger v. Christ Hosp. & Anesthesia Assocs. of Cincinnati*, 2005-Ohio-5205, ¶ 21 (1st Dist.), quoting *Brokamp v. Mercy Hosp.,* 132 Ohio App.3d 850, 870 (1st Dist. 1999).

**{¶133}** It should come as no surprise that this is not the first time this court has considered the effect of Dr. Durrani's absence at trial. *See Hounchell,* 2023-Ohio-2501, at ¶ 65 (1st Dist.). In *Hounchell,* the trial court instructed the jury that it was "allowed to consider . . . the fact that Dr. Durrani did not attend the trial and testify to specific facts about the case in his defense. *And you may make whatever inference and conclusion you choose to from that fact.*" (Emphasis in original.) *Id.* We held that this instruction impermissibly invited the jury to draw "both impermissible and

negative inferences." *Id.* at ¶ 69. Specifically, the instruction "allowed the jury to infer that Durrani was absent because of a consciousness of guilt or because of implicit biases against those of Pakistani descent, both of which are impermissible." *Id.*

**{¶134}** In *Jones,* we held that the trial court erred when it gave a jury instruction identical to the instruction given in this case:

> Dr. Durrani has voluntarily left the jurisdiction removing himself from plaintiff's ability to subpoena him to trial. When a party such as Dr. Durrani has relevant evidence or testimony within his or her control, and the party failed to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party.

*Jones*, 2024-Ohio-1776, at ¶ 30 (1st Dist.). First, we noted that "instruction necessarily requires the inference to be made" and did not limit the jury's inference to evidence that "Dr. Durrani would 'naturally' produce." *Id.* at ¶ 34. But we held that this error was harmless because the jury instructions did not suggest that the jury was misled because the trial court also told the jury that it was not required to draw inferences and "[w]hether an inference is made rests entirely on you." *Id.* at ¶ 37.

**{¶135}** Like in *Jones*, the trial court prefaced its adverse-inference instruction by defining an "inference" and explained, "Whether an inference is made rests entirely with you." The trial court instructed the jury to "not speculate on why [Dr. Durrani] is not present or consider his absence for any purpose except as instructed." It informed the jury that Dr. Durrani "voluntarily left the jurisdiction, removing himself from the plaintiffs' ability to subpoena him to trial." So, it explained to the jury that, when a party "has relevant evidence or testimony within his or her control and the party fails

to produce that relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party."

**{¶136}** Because the jury instruction in this case is identical to the instruction in *Jones*, that opinion governs our analysis and is determinative in this case. Context matters and, when read as a whole, the jury instructions informed the jury that it had discretion to decide what inferences it drew from the evidence. Like in *Jones*, there is no indication on the face of the record that the instruction infected the jury's decision.

**{¶137}** Because the Durrani parties have failed to prove that the trial court committed a reversible error, they were not entitled to a new trial or judgments notwithstanding the verdicts. We overrule the second assignment of error.

### *Dr. Saini did not testify outside of his area of expertise*

**{¶138}** In their third assignment of error, the Durrani parties argue that the trial court impermissibly allowed Dr. Saini to testify outside of his area of expertise. They maintain that Dr. Saini, a neuroradiologist, testified about a surgeon's use of an operative report and surgical practices, and about Dr. Durrani's surgical technique.

**{¶139}** Expert testimony is governed by Evid.R. 702. A witness may testify as an expert when he is "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). In Ohio, a witness testifying in a medical-malpractice case ""need not practice in the exact same specialty as that of the defendant-physician; rather, it is the scope of the witness's knowledge and not the artificial classification by title that should govern the threshold question of his qualifications."" *Adams*, 2022-Ohio-60, at ¶ 50 (1st Dist.), quoting *Guiliani v. Shehata,* 2014-Ohio-4240, ¶ 42 (1st Dist.), quoting *Alexander v. Mt. Carmel Med. Ctr.,* 56 Ohio St.2d 155, 160 (1978). So long as the expert witness demonstrates knowledge of the standards of the specialty, and that

knowledge enables the witness to provide expert testimony involving whether the defendant's conduct conformed with that specialty's particular standards, the witness is competent to testify as an expert. *Alexander* at 160.

**{¶140}** In *Adams*, we recognized that a radiologist's duties overlap with a surgeon's because a surgeon's minimum standard of care "includes reviewing diagnostic images before determining whether surgery is necessary." *Adams* at ¶ 55. So, "[a] radiologist is qualified to opine on a surgeon's standard of care in reviewing diagnostic images and ordering surgery based on those images." *Id.* at ¶ 57. We held in *Adams* that issues surrounding informed consent fell within Dr. Saini's area of expertise because "[g]etting informed consent is a practice that is standard across all types of doctors." *Id.* at ¶ 60.

**{¶141}** Here, Dr. Saini explained that, as a neuroradiologist, he "specializes in imaging of the brain, the spinal cord, the head and neck, eyes, ears." Unlike general or diagnostic radiology, he has 17 years of training on "spinal cord abnormalities, with the head, the neck, the brain." He has performed "invasive" radiology and procedures like "putting in lines and doing facet blocks, nerve blocks[,] . . . myleograms." He has experience teaching "neurologists and attendings on how to read films," and training orthopedic surgeons. He testified that a neuroradiologist's and orthopedic-spine surgeon's interactions are important for diagnosing patients.

**{¶142}** The Durrani parties argue that Dr. Saini testified outside of his area of expertise when he discussed "what surgeons typically do with operative reports." But that testimony was part of a broader discussion of the information a neuroradiologist needs when reviewing post-operation film. Dr. Saini testified that neuroradiologists must be familiar with orthopedic spine surgery processes and procedures because they must "understand what an orthopedic surgeon is doing to see if the surgery is going

the right way or it's not going the right way . . . and convey that [to the surgeon]." When viewing post-operation film, Dr. Saini testified that he consults the operative report to see "if there's some discrepancy [between the pre-operation note and the film]" and if the surgeon deviated from the pre-surgery plan. The operative report communicates the surgeon's decision making to others. Accordingly, Dr. Saini's testimony involving operative reports did not stray outside of his area of expertise as a neuroradiologist.

{¶143} Next, the Durrani parties argue that Dr. Saini's discussion of TLIF surgeries, recovery time, and Dr. Durrani's technique in Bowling's surgery fell outside of his expertise. But Dr. Saini described the purpose of a TLIF to explain that evidence of a healed fusion appears within "six months to a year . . . through a radiologic study." He discussed laminectomies to show why Ravenscraft's imaging conflicted with Dr. Durrani's finding that Ravenscroft had a prior laminectomy. Dr. Saini also testified that he reviewed Bowling's post-operation film, which made him "wonder[] whether this pedicle screw was put in correctly or not, because it looks like it's more laterally displaced. These tiny little dots [are] from the anterior spinal fusion. It's from the TLIF." This testimony concerned Dr. Saini's interpretation of Ravenscraft's and Bowling's imaging, which falls within his area of expertise as a neuroradiologist.

{¶144} In sum, Dr. Saini's testimony fell within the scope of his expertise as a neuroradiologist. Therefore, we overrule the third assignment of error.

### *The record did not support an itemized-damages jury interrogatory*

{¶145} The Durrani parties' final assignment of error asserts that the trial court erred when it improperly failed to give their requested interrogatories to the jury. While the Durrani parties maintain that the trial court erred when it failed to submit "many" interrogatories to the jury, their argument focuses on proposed interrogatory 15, which states

State in ink the percentage of the total non-economic damages awarded

in Interrogatory #23[3] that you allocate to each of the following:

1. Negligence in performing [plaintiff's] surgery_____%

2. Lack of informed consent for surgery _____%

3. Battery _____%

4. Fraudulent misrepresentation of the necessity or indication for the

surgery _____%

**{¶146}** Interrogatories allow parties to "'test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict.'" *Moretz v. Muakkassa*, 2013-Ohio-4656, ¶ 79, quoting *Freeman v. Norfolk & W. Ry. Co.,* 69 Ohio St.3d 611, 613 (1994). Under Civ.R. 49(B), the trial court "shall submit written interrogatories to the jury . . . upon request of any party prior to the commencement of argument." This "mandatory duty" arises "[w]hen both the content and the form of a proposed interrogatory are proper." *Moretz* at ¶ 79. Yet, a trial court has "discretion to reject interrogatories that are inappropriate in form or content . . . [and] may reject a proposed interrogatory that is ambiguous, confusing, redundant, or otherwise legally objectionable." *Freeman* at 613. Typically, we would review the trial court's decision to reject a proposed interrogatory for an abuse of discretion. *Id.* at 614.

**{¶147}** But the Durrani parties have forfeited all but plain error. When given the opportunity, a party has a duty at trial to raise an objection to any claimed error to preserve that error for appeal. *WBCMT 2007-C33 Office 7870, LLC v. Breakwater Equity Partners, LLC,* 2019-Ohio-3935, ¶ 34 (1st Dist.), quoting *In re J.J.,* 2006-Ohio-5484, ¶ 15. A party's failure to object to any error in the trial court's jury interrogatories

---

[3] Interrogatory 23 is not in the record.

or instructions forfeits all but plain error on appeal. *See Calloway v. McKenna,* 2023-Ohio-3130, ¶ 19 (1st Dist.) (interrogatories); *see also City of Westlake v. Y.O.,* 2019-Ohio-2432, ¶ 34 (8th Dist.) (instructions).

**{¶148}** The Durrani parties submitted their interrogatories to the trial court before trial. After the patients submitted their proposed jury instructions during trial, the trial court reviewed the jury interrogatories and instructions with the parties. The trial court invited feedback from the Durrani parties. While they objected to the adverse-inference instruction and requested "an instruction on comparative fault for Mrs. Bowling," the Durrani parties failed to mention their proposed interrogatory 15. Moreover, the Durrani parties failed to object when the trial court read the interrogatories to the jury. And after the trial court finished reading the interrogatories to the jury, the trial court explicitly asked if there were "any exceptions on behalf of . . . defendants?" The Durrani parties responded, "No, Your Honor." And before sending the jury to deliberate, the trial court asked, "Did I forget anything? Anything . . . on behalf of defendants?" The Durrani parties again responded, "No, Your Honor."

**{¶149}** Appellate courts may find plain error when an appellant establishes that the trial court committed a plain or obvious error, which affected a substantial right. *Cable Busters, LLC v. Mosley*, 2020-Ohio-3442, ¶ 7 (1st Dist.). But in civil cases, plain error is reserved for "'extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.'" *Id.*, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997).

**{¶150}** On appeal, the Durrani parties do not develop any argument suggesting that the trial court's omission of their proposed interrogatory amounts to a

plain error. Under these circumstances, "we will not sua sponte undertake a plain-error analysis on [a party's] behalf." *Id.* at ¶ 8.

**{¶151}** Because the Durrani parties failed to object to the trial court's omission of their interrogatory and failed to argue plain error on appeal, we overrule their fourth assignment of error.

### III. Conclusion

**{¶152}** We overrule the assignments of error and affirm the trial court's judgments.

Judgments affirmed.

CROUSE, P.J., and MOORE, J., concur.